(Nos. 58258, 58309 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant and Appellee, v. ALAN R. TAYLOR, Appellee and Appellant.

*Opinion filed April 4, 1984.*

Neil F. Hartigan, Attorney General, of Springfield, and John A. Barra, State's Attorney, of Peoria, (John X. Breslin and Gary F. Gnidovec, of the State's Attorneys Appellate Service Commission, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Frank W. Ralph, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellant.

JUSTICE SIMON delivered the opinion of the court:

The defendant, Alan R. Taylor, was convicted in the circuit court of Peoria County of felony murder and armed robbery and sentenced to concurrent terms of 35 and 30 years, respectively. The appellate court reversed the conviction on the ground that the trial court's denial of defendant's motion for a change of venue because of prejudicial pretrial publicity deprived the defendant of trial by a fair and impartial jury and remanded for a new trial outside the range of Peoria publicity. (113 Ill. App. 3d 467, 472-73, 478.) The People appealed, and the defendant appealed as well from that portion of the deci-

sion affirming the transfer order from the juvenile court and denying his motion to suppress statements. We allowed both appeals and consolidated them. 87 Ill. 2d R. 315.

On December 6, 1980, the cash register at the Zip-Tone Cleaners in Peoria was looted and 17-year-old Lisa Conn, who was in charge of the business, was found dead of knife wounds. The crime received extensive news coverage in two area newspapers, as well as daily attention from radio and television stations. Posters announcing a reward of approximately $20,000 were displayed throughout the area. The investigation was so extensive that it was moved from Peoria police headquarters to larger quarters at a local YMCA.

At the time of the murder, Taylor was 13 years old and had no police or juvenile record. He resided with Rebecca and David Rushing, his mother and his stepfather, a few blocks from the Zip-Tone. The defendant was questioned by Peoria police on December 18 and December 28, 1980, at which time he denied any involvement in the incident.

On February 7, 1981, at Detective Robert Crady's request, Mr. Rushing brought the defendant to the investigation headquarters at the YMCA where the defendant was questioned by Detectives Crady and Larry Layman for approximately four and one-half hours. The defendant was given *Miranda* warnings before questioning began, and Mr. Rushing was present during some of the questioning. On February 14, at Crady's request, Mr. Rushing again brought the defendant for questioning at the YMCA. The pair arrived at approximately 1:10 p.m., and, by approximately 5:30, the defendant had given an oral statement implicating himself in the murder. After dinner, Detective Crady and a secretary prepared a written statement which the defendant read, corrected, initialed and signed. The session ended at approximately

9:30 p.m., when the defendant was taken into custody.

In his statement, Taylor said that he and 16-year-old Jon Gaskins were walking with a 12-year-old boy when he and Gaskins decided to go into the Zip-Tone to get some money. Gaskins went into the back room and asked Lisa for money. When she refused, Gaskins told Taylor to stand behind Lisa. Both boys had knives, and Taylor held his to Lisa's throat. She cut her neck on Taylor's knife as she struggled. She then kicked Gaskins, who stabbed her repeatedly with his knife. Gaskins took money from the cash register and gave some to Taylor. The two boys ran.

As a result of Taylor's statement, delinquency petitions were filed against both Taylor and Gaskins. The People's motion to transfer the case from juvenile court and to try Taylor as an adult was granted. Shortly after Gaskins was given a lie detector test, charges against him were dropped for insufficient evidence. The defendant's motion to suppress his oral and written statements of February 7 and 14 was denied.

The defendant has consistently maintained that extraordinary publicity prevented him from receiving a fair trial. When the defendant's request for funds to conduct a professional public opinion survey was denied, his attorney organized volunteers to survey passersby at an area shopping mall. The results were appended to the defendant's motion for a change of venue.

The public opinion survey included registered voters in Peoria, Tazewell and Woodford Counties. Of the 382 Peoria County voters surveyed, 378 had heard of the case, including 188 who had heard of it often, and 122 who had heard of it many times. Sixty-one percent of those polled could state the defendant's exact age, and many others knew he was under 16. Seventy-two percent believed that the police had arrested the right person, and 53 percent believed that the defendant was

guilty.

Before jury selection began, the trial judge denied the motion for a change of venue, expressed his belief that an unbiased jury could be obtained in Peoria County through exhaustive *voir dire*, and advised counsel that a motion for change of place of trial could be made after jury selection. During *voir dire*, many of the defendant's challenges for cause based on prospective jurors' knowledge of inadmissible and highly prejudicial details of the investigation were denied, as were a defense motion for additional peremptory challenges due to the extensive public knowledge of the case and a renewed motion for change of place of trial due to sworn jurors' knowledge of inadmissible and highly prejudicial information. Defendant exhausted all of his peremptory challenges.

Media coverage of this case in Peoria and the surrounding communities was unprecedented. An affidavit from the manager of one of the Peoria radio stations called this the most widely publicized case he had seen in Peoria. Detailed coverage began on the day of the crime, and the progress of the police investigation, the juvenile court proceedings, the hearing, *voir dire*, and trial in the adult division were all fully and closely reported. Repeated references were made to the defendant by name and to the original codefendant, Jon Gaskins. Details of Taylor's February 14th statement were reported, including that he was standing behind Lisa, her "accidental" contact with his knife, and the alleged stabbings in the stomach by Gaskins. Gaskins' release was extensively reported, along with the information that, while the State's Attorney's office would say only that there was insufficient evidence, Gaskins' attorney announced that Gaskins was released after he passed a lie detector test. At the same time, it was reported that Taylor also took a lie detector test with inconclusive results. One newspaper article went so far as to say that Taylor took a poly-

graph exam a few weeks after the murder and "he did not pass," but Gaskins took a similar test and "passed on every important question." In another article, Taylor's confession and his inconclusive lie detector results were both mentioned. Still another article referred to Taylor as the individual "who actually stabbed and slashed Lisa Conn to death."

On appeal to this court, defendant suggests that the juvenile court lacked jurisdiction to transfer this case to the adult division since notice was not provided to the minor's natural father. We do not find this contention persuasive because notice was properly provided to the custodial parent, the mother. The mother and especially the stepfather were actively involved in the police investigation and questioning of Taylor. There is no indication in the record that Taylor's natural father had shown any interest in his care or well being for many years preceding the transfer hearing.

The Juvenile Court Act provides that the clerk of the court must issue a summons to a minor against whom a delinquency petition has been filed and to each respondent named in the petition to appear and answer the petition. (Ill. Rev. Stat. 1979, ch. 37, par. 704—3.) The natural parent must be named as a respondent. (Ill. Rev. Stat. 1979, ch. 37, par. 704—1.) Provision is made for personal service, service by registered mail or by publication. (Ill. Rev. Stat. 1979, ch. 37, pars. 704—3, 704—4.) In this case, no service was attempted on Taylor's natural father.

This court has previously held that failure to provide notice to an absent parent is not always jurisdictional. (*In re J.W.* (1981), 87 Ill. 2d 56.) The statute provides that publication notice to the absent parent is not required "when the person alleged to have legal custody of the minor has been served with summons personally or by certified mail, but the court may not issue any order

or judgment against any person who cannot be served with process other than by publication unless notice by publication is given or unless that person appears." (Ill. Rev. Stat. 1979, ch. 37, par. 704—4(2).) In this case, the court was not trying to, nor did it, issue any order or judgment against the absent natural father. That father's rights were not adjudicated or affected in any way by the adjudication of the delinquency petition against Taylor. Therefore, notice to the absent father was not jurisdictional, and the failure to provide notice did not deprive the juvenile court of the right to dispose of the petition by transfer of the proceedings to the criminal court.

This case is not controlled, as defendant suggests, by *People v. R.D.S.* (1983), 94 Ill. 2d 77. In that case, we held that due process of law was violated because the minor's court-appointed guardian was not notified of a delinquency petition involving a theft charge. Here the mother, the parent having custody and control, was properly served. The minor, the mother and the stepfather all were sufficiently informed of the charges to enable the minor to prepare an adequate defense. That is what is required by Illinois statute, and it is sufficient to satisfy due process of law.

Defendant next suggests that the Illinois juvenile transfer statute in operation at the time is unconstitutional because it fails to provide adequate due process safeguards. This court has previously resolved this issue, and we find no need to readdress it here. *People v. Taylor* (1979), 76 Ill. 2d 289.

The defendant's principal issue is that he was denied a trial by a fair and impartial jury for four related reasons: (1) denial of the motion for change of venue; (2) denial of challenges for cause based on actual knowledge of inadmissible and highly prejudicial information; (3) denial of additional peremptory challenges; and (4) denial of the

defendant's motion to sequester the jury during the trial and during jury deliberations. The first three are different ways of saying that the defendant was denied a fair trial because jurors had actual knowledge of inadmissible material prior to selection on this panel.

We begin by agreeing with the holding of the appellate court that the trial judge erred by denying the defendant's motion for a change of venue due to prejudicial publicity. Our system of criminal justice depends to a large extent on the participation of fair and impartial jurors. They must decide the case on the basis of evidence presented during the trial, not on the basis of information received or opinions formed from outside sources. See, *e.g., Sheppard v. Maxwell* (1966), 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507; *Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639; *Marshall v. United States* (1959), 360 U.S. 310, 3 L. Ed. 2d 1250, 79 S. Ct. 1171.

It is not necessary that jurors be unaware of the case before they assume their roles in the jury box. Crimes, especially heinous crimes, are of great public interest and are extensively reported. It is unreasonable to expect that individuals of average intelligence and at least average interest in their community would not have heard of any of the cases which they are called upon to judge in court. Total ignorance of the case is exceptional, and it is not required. (*Irvin v. Dowd* (1961), 366 U.S. 717, 722-23, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1642-43.) What is required is the assurance that a juror will be able to set aside all information he has acquired outside the courtroom, along with any opinions he has formed, and decide the case strictly on the evidence as presented in the courtroom. *Irvin v. Dowd* (1961), 366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1643.

Although the decision to accept a potential juror as

an impartial trier of fact is discretionary with the trial judge, the trial judge is obliged to insure that, in fact, the defendant receives a trial before a fair and impartial jury. If the defendant was deprived of this right because of the denial of a motion for a change of venue, or because of the denial of challenges for cause of individual jurors, his conviction must be reversed and he must receive a new trial.

In this case, the trial judge was faced with a difficult—perhaps an impossible—task. The record indicates his awareness of the publicity problem and his commitment to the selection of a fair and impartial jury. *Voir dire* in this case was conducted largely by the trial judge and lasted three days. Each prospective juror was asked a series of questions dealing with his knowledge of the case, including his exposure to and memory of written and broadcast reports. When a juror remembered certain key details, that juror was specifically asked if he had formed any opinions or drawn any inferences from those facts.

The record of the *voir dire* as a whole indicates widespread awareness of this case. There were almost no prospective jurors who knew nothing of the case. Even individuals who initially stated that they remembered very little responded to further questions by providing details. If a potential juror remembered one fact, it was likely to be that two boys were arrested, but one was released. This alone demonstrates the saliency of the information. When it became apparent that, in view of the details of the information that had been disseminated by the extensive press coverage, it would not be possible to find 12 jurors who were sufficiently unfamiliar with the facts highlighted by the media to be able to reach a verdict based solely on admissible evidence presented in the courtroom, the trial judge was obliged to grant the defendant's motion for change of venue.

Six seated jurors were aware that the codefendant in this case had been released. Three of these individuals specifically connected Gaskins' release to his performance on the lie detector test. After initially stating that she knew only a "little bit" about the case, Carolyn Edwards said, "I remember reading or seeing that on TV ***. Then I remember hearing that he was released from custody because of an inconclusive lie detector test or something like that." Asked if she had formed an opinion about the case, she expressed uncertainty, finally saying, "I don't think I have." Although she answered in the negative when asked if the defendant must be the right person or must be guilty because he was charged, she also said that "if somebody is arrested, they must have some—some information—*** that would lead to that arrest." In isolation, her statement is reasonable, especially when she said that she could base a decision solely on what she heard on the witness stand. The problem is the prejudicial effect of the knowledge of the lie detector test. Knowing that the codefendant was released because of the polygraph test, believing that there was good reason that the defendant was arrested, and knowing that defendant was not released, she could well infer impermissibly that defendant had failed a polygraph test and therefore must be guilty. In any event, Edwards was not challenged for cause and an available peremptory was not used to remove her. While we will never know defense counsel's strategy, the record indicates that several prospective jurors had already made far more prejudicial statements than Edwards, and counsel could anticipate that the venire contained many individuals influenced by the press coverage. Counsel may have been attempting to preserve his remaining peremptories for jurors with more objectionable views.

In the case of the other five jurors with knowledge of Gaskins' release, defense counsel's challenges for cause

were denied, and the record was properly preserved for review. Two of these jurors were seated after defendant had exhausted his peremptory challenges and his motion for additional peremptories had been denied. One of these individuals, Leonard Lingenfelter, remembered that Gaskins "was passed on a lie detector test and was released." He then stated twice more that Gaskins had been "cleared through a lie detector test." There can be no doubt that the fact was meaningful to him since he used words such as "passed" and "cleared," and he mentioned it three times. The trial judge attempted to ascertain the extent to which Lingenfelter had been influenced by this information by asking whether the juror "thought anything" when he read that Gaskins had been released, and whether he had any assumptions or feelings about Taylor because he knew that Gaskins had been released and Taylor had not. Lingenfelter answered in the negative, but the judge was in a no-win situation. The questions themselves served to call attention to an idea which Lingenfelter might not have considered.

Juror Dale Thorpe was also examined after defendant had exhausted his peremptories. Thorpe remembered that an older boy "allegedly involved in the beginning" had "passed a lie detector test and was released." The release "made [Thorpe] believe he was innocent." Thorpe responded that Gaskins' release did not lead him to believe anything about Taylor. Once again, the judge's questions may have raised a possibility which Thorpe had not previously considered.

Three other jurors, Jeffrey Jacobson, Betty Schlick and Betty Janssen, all had knowledge that a codefendant had been released due to insufficient evidence. Although Jacobson initially claimed to know "just a few things" from the news, he was able to state a number of important details, including Taylor's and Gaskins' names, the dropping of charges against Gaskins for lack of evidence,

Taylor's position standing behind Lisa Conn when the incident occurred, and the fact that the neck wound was deep enough to cause death. After the defense challenge for cause was denied, the defense attorney stated on the record that he would not use a peremptory because he had so few left.

Janssen lived in the vicinity of the incident, traded at the Zip-Tone, and had a daughter who recently graduated from the school attended by Taylor. She knew the two names and knew that Gaskins had been released because of insufficient evidence. Similarly, Schlick lived in the area, had traded at the store, and knew that the codefendant had been released because there was not enough evidence against him.

In the case of these five jurors, the trial judge denied the challenges for cause because of the answers the jurors gave when asked whether they had formed any opinions regarding the guilt or innocence of Taylor, and whether they could set aside anything they had read or heard outside the courtroom and decide the case strictly on the basis of the evidence presented in court.

In *Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639, the Supreme Court reversed a murder conviction in the light of extensive and prejudicial publicity which made it impossible to obtain an impartial jury. The *Irvin* court acknowledged the impossibility of finding a completely naive jury, stating that "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." (366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1643.) The court went on to say that the existence of an opinion which raises a presumption of partiality is a mixed question of law and fact, and that a reviewing court has an obligation to independently evaluate the *voir dire* testimony of the jurors. (366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1643.)

Finally, the court quoted with approval Chief Justice Hughes' statement in *United States v. Wood* (1936), 299 U.S. 123, 145-46, 81 L. Ed. 78, 88, 57 S. Ct. 177, 185, "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."

The *Irvin* doctrine is applicable in this case. It would be sufficient if we could state with certainty that the jurors were able to lay aside any preformed opinions. However, there is no simple test which we can apply to every case. Both *Irvin* and *People v. Yonder* (1969), 44 Ill. 2d 376, require that we examine the record to determine independently whether the defendant received a fair trial. On the totality of the record in this case, we conclude that he did not.

Under the circumstances of this case, the jurors' bare assertions that they either formed no opinions about the guilt or innocence of the defendant, or that they could lay those opinions aside, were insufficient. As a result of the extensive pretrial publicity, six of the sworn jurors in this case, half of the panel, had knowledge of the codefendant's release due to insufficient evidence. Three of the jurors stated that the release was related to performance on a lie detector test; two used words like "passed" and "cleared." Since some of the articles and reports mentioned both insufficient evidence and lie detector tests, it is possible that even those jurors who did not mention the polygraph were aware of it.

Lie detector tests are inadmissible in Illinois to prove either guilt or innocence. (*People v. Baynes* (1981), 88 Ill. 2d 225.) The reason is twofold. On the one hand, the results of polygraph examinations are not sufficiently reliable to be used to prove guilt or innocence. On the other hand, because of their quasi-scientific appearance,

the results of polygraph examinations are likely to be given undue weight in the minds of jurors. The possibilities for prejudice are obvious; jurors will assume that the polygraph is reliable. Jurors do not have the experience or the technical skill to understand that a reported "failure" might in fact be a "pass," or vice versa, much less that "inconclusive" is not another word for "failure."

Even under the controlled and standardized conditions of courtroom procedure, the danger is too great that jurors will not understand the disclaimers, will be unprepared to evaluate the conflicting testimony of experts, will not be able to heed the admonitions of the trial judge, and will, in the end, overemphasize the polygraph results. The danger is so great that we will not allow the evidence to be produced in court even where the defendant agrees to its use. (88 Ill. 2d 225, 240, 244-45.) In *People v. Yarbrough* (1982), 93 Ill. 2d 421, we granted a new trial because the judge may have been influenced by his own suggestion of a polygraph test during consideration of a post-trial motion. As we said in *Yarbrough*, "[o]ur emphatic and unequivocal conclusion in *Baynes* that polygraph evidence is not reliable enough to be given consideration in any manner applies to its use by any participant in the trial process, whether it be by the trial judge *** or by the finder of fact, be it judge or jury." 93 Ill. 2d 421, 426-27.

Our holdings in *Baynes* and *Yarbrough* make it unthinkable to allow jurors to be influenced by information regarding a lie detector test when it was obtained out of court. If the biasing effect of the information is so powerful that it cannot be considered, even under the controlled conditions of the courtroom, then certainly access to the same biasing information, under the uncontrolled influence of the news media, cannot be allowed to affect the outcome of a trial. The nature of the information is such that the only way to be sure that a juror is not in-

fluenced by it is to insure that the juror is never exposed to the information in the first place. Once the juror believes that a law enforcement or prosecutorial decision has been based upon the results of a lie detector test, the damage has been done. In this case, once the sworn jurors were aware that the codefendant was released "because of" his performance on a lie detector test, there was no way to control the inferences these jurors would draw regarding Taylor's performance on a similar test and the fact that Taylor was being prosecuted. It is even more likely that any particular juror would have drawn that inference when the information about the lie tests was contained in news reports which used prejudicial terms like "pass," "fail," "clear," which mentioned the fact that Taylor as well as Gaskins was given a test, which juxtaposed information about Taylor's lie test performance with mention of his "confession," and which contained no information or disclaimers regarding the dubious validity or reliability of lie detection.

The problem here is a perplexing one which does not require appraisal of the sincerity of either the jurors or the trial judge. It is most probable that the jurors spoke sincerely when they testified that they had formed no opinions on the basis of the information that one defendant passed a lie detector test and was released, and the other was not released. The concern is that this information about polygraphs, by its nature, is unlike other factual details. This is not the type of information which the average juror can easily ignore. Its effect is subtle and unconscious, but at the same time potent. Whether or not the juror is aware of it or can express his feelings accurately, exposure to this type of highly inflammatory material is enough to raise the presumption of partiality. In order to protect the defendant's right to a fair and impartial jury, those jurors who had been tainted in this way should have been excused.

The trial judge's dilemma is apparent. Once the judge is aware that there has been intensive publicity which included dissemination of inadmissible and highly prejudicial information, the judge has no choice but to inquire as to the details which the potential juror remembers. As soon as the juror mentions these details, that juror is subject to a challenge for cause. Any further questions serve only to highlight the information and to increase the likelihood that any inferences, once drawn, will now be remembered, and any inferences not yet drawn, will now be drawn. There is no alternative but to excuse the potential juror.

This position is well grounded in existing law. In *Sheppard v. Maxwell* (1966), 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507, a murder conviction was reversed because of pervasive pretrial publicity and a variety of disruptive conditions accompanying trial. One of the results of the publicity was exposure of the jurors to inadmissible, prejudicial information; some of the stories referred to the defendant's refusal to take a lie detector test, the "clearing" of other suspects through lie detection, and the defendant's refusal to be injected with "truth serum." 384 U.S. 333, 338-39 n.5, 16 L. Ed. 2d 600, 606-07 n.5, 86 S. Ct. 1507, 1510 n.5.

The situation was succinctly summarized by the Supreme Court in *Marshall v. United States* (1959), 360 U.S. 310, 3 L. Ed. 2d 1250, 79 S. Ct. 1171. In *Marshall*, petitioner was convicted of violation of a Federal statute involving unlawful dispensing and misbranding of drugs. Newspaper accounts referred to petitioner's wife's conviction and sentence on related charges, and to petitioner's prior conviction for forgery, and stated that there was no evidence that he was a doctor. When individually questioned by the judge during the trial, seven of the jurors admitted at least scanning the articles. Each juror stated that he would not be influenced by the articles,

could decide the case only on the evidence of record, and would not be prejudiced against petitioner. Based on these answers, the trial judge denied a motion for a mistrial. The Supreme Court reversed. After acknowledging the trial court's discretion in such matters, the Court said: "We have here the exposure of jurors to information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence. The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence. [Citation.] It may indeed be greater for it is then not tempered by protective procedures." (360 U.S. 310, 312-13, 3 L. Ed. 2d 1250, 1252, 79 S. Ct. 1171, 1173.) That is precisely the situation here.

We are unpersuaded by the People's argument that the appellate court decision in this case establishes a *per se* standard for change of venue whenever a criminal case receives extensive pretrial publicity. The People's argument misapprehends the basis of the appellate court holding as well as the existing case law in Illinois. Both our opinion and that of the appellate court in this case are consistent with prior decisions and work no change in Illinois law.

Neither the appellate court holding in this case, nor our holding here, are based on the sheer amount of publicity in this case, or on the bare potential for bias. What we have in this case is the documented fact of the unprecedented volume of publicity combined with the exposure of impaneled jurors to inadmissible, highly prejudicial information pertaining to the release of the codefendant because of his performance on a lie detector test. The defendant's right to a trial by a fair and impartial jury was infringed as soon as the potential jurors were shown to have been exposed to this peculiarly persuasive material. At that point, the trial judge erred by

denying the challenges for cause. Having denied those challenges for cause, he erred again by denying the renewed motion for change of venue.

There has never been any question in Illinois that the defendant is entitled to a change of venue in order to insure that he receives a fair trial. The cases relied upon by the People are inapposite. Although it is true that this court has in the past held that it was not reversible error to deny a change of venue on the basis of widespread publicity alone, those cases arose in contexts different from this one. Even in cases where no transfer was required, this court has repeatedly insisted that the test is whether the defendant did in fact receive a fair trial. (*Cf. People v. Black* (1972), 52 Ill. 2d 544, 558; *People v. Yonder* (1969), 44 Ill. 2d 376, 388.) In prior cases, publicity either was not as prejudicial in kind or amount as was the case here, or was concentrated during the period immediately after the occurrence and ended long before trial. (*People v. Torres* (1973), 54 Ill. 2d 384; *People v. Gendron* (1968), 41 Ill. 2d 351; *People v. Hagel* (1965), 32 Ill. 2d 413.) This case stands in stark contrast, the key difference being the peculiar nature of the publicized material regarding the lie tests, material which is inadmissible and highly prejudicial and the effect of which cannot be easily determined on *voir dire*. Also, in prior cases, defense counsel either did not seek to question the jurors regarding their exposure to prejudicial publicity, or at least did not challenge the seating of the jurors, or object on the basis of juror partiality. (*People v. Torres* (1973), 54 Ill. 2d 384, 389; *People v. Gendron* (1968), 41 Ill. 2d 351, 356; *People v. Hagel* (1965), 32 Ill. 2d 413, 414-15.) Here, defendant's counsel moved for funds to document professionally the extent of the publicity, proceeded to conduct his own survey without those funds, presented the results to the court along with a motion for change of venue, challenged five seated ju-

rors for cause on just these grounds, moved for additional peremptory challenges on the basis of the publicity, and renewed his motion for change of venue at the close of the *voir dire*. There can be no question that defendant was concerned about the publicity question, and that his counsel vigorously established that concern before any evidence was received and preserved the issue for review.

We adhere to the standard established in *People v. Yonder* (1969), 44 Ill. 2d 376. "Our basic consideration here is not necessarily the correctness of the trial court's rulings on the defendants' motions for change of venue and sequestration or the amount of publicity involved, but whether upon the record as a whole the defendants received a trial before a fair and impartial jury since these rulings were proper if defendants actually received such a trial. [Citation.]" (44 Ill. 2d 376, 388.) This court essentially repeated the *Yonder* standard in *People v. Black* (1972), 52 Ill. 2d 544, 558. While the court found no error in the failure to grant a change of venue in *Black*, again the situation was very different than here. Significantly, there was no publicity at all during the period immediately preceding the trial, a fact which in combination with the jurors' responses on *voir dire*, indicated that the effect of the publicity had dissipated. In addition, the defendant had three peremptory challenges available which he could have used to remove jurors he believed were biased by the publicity. On the records in *Yonder* and *Black*, the court concluded that the defendants there received a fair trial. On the record here, we conclude that the defendant did not.

Our discussion above has dealt sufficiently with the related issue of the denial of the challenges for cause of those jurors who knew of the codefendant's release. We note again that our holding in this case is consistent with prior Illinois law. As in the case of a motion for a

change of venue based upon prejudicial pretrial publicity, the real issue is whether the defendant in fact received a' trial by a fair and impartial jury. In the ordinary case, the best way to determine whether a juror can be impartial is to ask. In other words, *voir dire* is a significant tool in determining whether a juror can lay aside any biases and make a determination solely on the basis of evidence presented in court. (*People v. Hyche* (1979), 77 Ill. 2d 229; *People v. Cole* (1973), 54 Ill. 2d 401.) In both cases, this court held that the defendant had in fact received a fair trial. Both were different from this one, however, since they dealt with potential bias due to the relationship between a juror and someone involved in the case. The problem was much easier to pinpoint and to explore in *voir dire* than the subtle and insidious effect with which we are dealing there. Further, in *Hyche*, the problem was solved when the juror involved was replaced before a verdict was reached.

The ABA Standards for Criminal Justice deal more pointedly with the precise problem presented here: "A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to the prospective juror's testimony as to state of mind." (ABA Standards for Criminal Justice, ch. 8, sec. 3.5(b), at 8—43 (2d ed. 1980).) In this situation, disqualification is automatic. ABA Standards for Criminal Justice, Commentary, ch. 8, sec. 3—5(b), at 8—47 (2d ed. 1980).

Defendant also suggests that he was denied a trial by a fair and impartial jury because his motions for additional peremptories and to sequester the jury were denied. Because we have already decided that the failure to allow the challenges for cause or to grant a change of

venue denied defendant a fair trial, these issues are unnecessary to consider.

Finally, defendant argues that his confession should have been suppressed by the trial court, both because the People did not establish that the defendant knowingly and voluntarily waived his rights or that his confession was voluntary, and because the confession must be considered involuntary under the totality of the circumstances. Because we remand for a new trial, we decline to address this question.

For the reasons stated above, we hold that the trial court erred in denying defendant's challenges for cause of five jurors and also erred in denying the motion for a change of venue due to prejudicial publicity when that motion was renewed at the close of *voir dire.* The appellate court's judgment is therefore affirmed, as modified herein. Although we recognize that four years have passed since this event occurred, we also recognize that the filing of this opinion will itself initiate a new round of press coverage. We remand to the circuit court of Peoria County with direction to grant defendant's motion for a change of venue to a county outside the scope of Peoria newspaper, television or radio coverage.

*Appellate court affirmed*
*as modified; circuit*
*court reversed.*