# Illinois Official Reports

## Appellate Court

*People v. Sheley*, 2014 IL App (3d) 120012

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NICHOLAS T. SHELEY, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0012 |
| Filed | August 13, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's denial of defendant's motion for a new trial on the ground that he did not receive a fair trial by an impartial jury in a prosecution for first degree murder, aggravated vehicular kidnapping, and possession of a stolen motor vehicle due to pretrial publicity was upheld by the appellate court, since the record established that the trial court seated an unbiased jury and defendant received a fair trial. |
| Decision Under Review | Appeal from the Circuit Court of Knox County, No. 08-CF-338; the Hon. James B. Stewart, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Fletcher P. Hamill (argued), of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (Garson Fischer (argued), Assistant Attorney General, of counsel), for the People. |

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Justices Carter and Holdridge concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Nicholas Sheley was convicted by a jury of first degree murder, aggravated vehicular kidnapping, and possession of a stolen motor vehicle, and sentenced to terms of imprisonment of natural life, 30 years and 7 years, respectively. He appeals his conviction, arguing that he was denied a fair trial by an impartial jury because of pretrial publicity. We affirm.

¶ 2                                    FACTS

¶ 3    In July 2008, defendant Nicholas Sheley was charged with numerous offenses, including first degree murder, aggravated vehicular hijacking, and possession of a stolen motor vehicle. 720 ILCS 5/9-1(a)(2), 18-4(a)(1), 16-1(a)(1)(A) (West 2008). The charges arose from a June 2008 incident in which Sheley was alleged to have beaten to death Ronald Randall, a Galesburg resident, stolen Randall's truck, and dumped Randall's body. The Galesburg incident was part of a string of offenses allegedly committed by Sheley over a several-day span in late June through early July 2008. The allegations included that Sheley murdered a man in Whiteside County on June 23 and stole his car; stole and burglarized other vehicles in Whiteside, Lee, and Rock Island Counties, and stole a company vehicle that he drove to Galesburg, where he committed the instant offenses on June 28. Sheley is further alleged to have then returned to Whiteside County where he murdered four people, including a two-year-old child, and then drove in Randall's truck to Festus, Missouri, where he killed two more people. Sheley was ultimately arrested on July 1, in Granite City, Illinois.

¶ 4    Extensive publicity followed the alleged crime spree and continued after Sheley's arrest on July 1, and local media covered the court proceedings throughout the pendency of the case. The record includes 389 articles and news report transcripts, the majority of which mention the crimes Sheley was alleged to have committed outside of Knox County. Throughout the pretrial proceedings, the press covered Sheley's disagreements with his lawyers, his decision to proceed *pro se* and his eventual return to representation by counsel, and pretrial incidents in the county jail, where Sheley assaulted other prisoners and jail staff. Media coverage also included abolishment of the death penalty in Illinois and its effects on the Sheley trial, as well as coverage about unrelated crimes committed by Sheley's brother. In September 2008, the trial court issued an order prohibiting extra-judicial statements after Sheley held a press conference at the county jail.

¶ 5    In March 2009, Sheley moved for a change of venue, arguing that the jury pool had been tainted by the extensive media coverage. Sheley filed a supplemental motion to change venue in June 2009, identifying specific instances of prejudicial information in the media reports. He argued that the pervasive media coverage exposed the jury pool to inaccurate, inflammatory, and sensationalized information, which was sympathetic to the victim's family, and that a demonstrative bias existed. Included with the supplemental motion were the results of a public

opinion survey commissioned by the defense. The survey indicated that as of June 2, 2009, the majority of people who responded to the survey and had heard at least some information about the case believed Sheley was guilty. Specifically, of the 850 people who responded, 76% recalled the case; 71% of those had at least some knowledge of it; 69% had learned about the case from the media and community discussion; 68% had an opinion about Sheley's guilt, with 87% believing him to probably be guilty; and 65% indicated they could be impartial as a juror. At the end of the poll, participants were provided the opportunity to leave a comment. The comments reflected that participants viewed Sheley as guilty, people were following the case, and the community was discussing it.

¶ 6    Sheley filed a second supplemental motion for change of venue in July 2009, arguing that the media continued to report facts that would be inadmissible at trial, including information about the other murders he was alleged to have committed. In response to the change of venue motion, the State argued that the opinion poll also revealed that 205 people had no knowledge, which changed the poll results. Per the State's calculations, only 41% of potential jurors indicated they could not be impartial. On October 28, 2009, defense counsel filed an affidavit in support of the motion to change venue, attesting that there continued to be extensive media coverage of the case, including 173 articles and broadcast reports. The affidavit presented the results of a second public opinion poll of 3,619 Knox County voters, with 997 people answering the survey questions to some degree. The results of the poll indicated that as of October 8, 2009: 79% had knowledge of the case, with 82% of that number admitting that they knew at least some details; 52% were aware of information from the media and 44% from the media and discussion in the community; 86% of the responders believed Sheley guilty and only 1% believed him innocent; and 63% stated it would be difficult to be impartial. Statements left in the comments section of the survey indicated the commenters had an extremely negative opinion about Sheley.

¶ 7    A hearing took place on Sheley's motion for a change of venue on November 6, 2009. The parties stipulated to exhibits of the media coverage of the case and the exhibits were entered into evidence. Following arguments of the parties, the trial court denied the motion as premature, finding that the only way to determine whether it was possible to seat an impartial jury was to attempt *voir dire*. The trial court distinguished the answers given by Knox County residents to the questions in the public opinion poll from their responsibilities as jurors, noting that as jurors, they are instructed on their role as well as the law. The trial court also expressed that Knox County had an interest in the proceedings and that the cost to transfer the proceedings elsewhere would be prohibitive. The trial court noted that a jury was recently seated in one day for Sheley's trial for aggravated battery based on incidents at the county jail, which suggested an impartial jury pool was available.

¶ 8    In March 2010, Sheley filed a second motion *in limine* to exclude evidence of the murders in Whiteside County and Missouri. The State filed an offer of proof, titled "Motion *in limine* to Admit Course of Conduct Evidence," to establish that the other crimes evidence was relevant to show Sheley's identity, motive and course of conduct. On the State's motion, the motion *in limine* was filed under seal to avoid tainting the jury pool with knowledge of Sheley's alleged other crimes. Following a hearing, the trial court held that the murder of Russell Reed in Whiteside County was admissible to show Sheley's motive and identification. The trial court found that evidence of the quadruple murder in Whiteside County and the double murder in Missouri was too prejudicial, although the evidence had some probative value. The trial

court determined there was too great a risk that if the jury was exposed to the other crimes evidence, it would find Sheley guilty based on the enormity of the alleged evidence against him. Considering that the jury could "simply conclude that the inquiry is over" with knowledge of the other crimes evidence, the trial court held the evidence of the quadruple murder in Whiteside County and the Missouri murders was inadmissible.

¶ 9    In March 2011, Sheley sought to represent himself. He had previously expressed a desire to represent himself, but withdrew his request in March 2009. The trial court granted Sheley's motion and he continued *pro se* until July 14, 2011, when he requested that counsel be reappointed, which the trial court allowed. On August 1, 2011, Sheley sought to conduct a third public opinion survey to determine the extent to which the jury pool had been tainted by the pretrial publicity. In his motion, Sheley argued that the media continued to report about all the murders Sheley was alleged to have committed, information deemed inadmissible by the trial court. The State responded that there was no showing of any pretrial publicity in 2011. The trial court denied the motion as untimely, noting that 700 jury summonses had already been issued and the trial was scheduled to begin in two weeks. The trial court reiterated that the only way to determine whether the jury pool was biased was to conduct *voir dire*.

¶ 10   *Voir dire* began on August 28, 2011. In total, 97 jurors were questioned over a six-day period; 69 were removed for cause. The final jury, with four alternates, was seated on September 7. Both parties exhausted their peremptory challenges. Each venireperson began with a questionnaire and was then individually questioned by the trial court and both parties. The *voir dire* revealed that most of the jury pool had heard something about the case at one time or another, with varying degrees of specific recollection and factual inaccuracies. Many potential jurors noted that the local media, including the local paper, *The Register-Mail*, covered the case extensively from the beginning, and that there was considerable discussion throughout the community about the case.

¶ 11   Seven jurors knew about the case but did not know Sheley was accused of other murders. Each of the seven stated he or she had not formed an opinion regarding Sheley's guilt and would judge the case on the evidence presented in court. Two of those jurors, Deena Allen and Rita Harris, were aware of another murder but knew no details and stated they would decide solely on the evidence presented. Sheley moved to excuse them for cause, arguing in part that they were aware of inadmissible other crimes evidence. The trial court denied the challenges, finding that the jurors stated they would be impartial and enter judgment only on the evidence presented. As to Harris, the trial court determined that her other crimes information was incomplete and inaccurate. Sheley used a peremptory challenge to excuse Allen.

¶ 12   Another juror, Kim Donnelly, had information that the Galesburg murder was part of a series of murders in other places. Donnelly indicated she had not read or heard anything for approximately three years before trial and had not formed any opinion regarding Sheley's guilt. Sheley also challenged this juror for cause on the grounds of her knowledge of other crimes evidence. The trial court denied the challenge, finding that the juror stated she had no opinion on Sheley's guilt, but would decide on the evidence at trial. Juror John Kraus also had knowledge of Sheley's other crimes and acknowledged it was hard not to form an opinion regarding Sheley's guilt. However, Kraus stated he did not have an opinion and would decide the case based on the presented evidence. Sheley challenged Kraus for cause, which the trial court denied.

¶ 13      Only two jurors had no knowledge of the case, although one heard discussion of the case at a barbeque the weekend in between jury selection and the start of trial. The juror, who brought the information to the court's attention, said she learned Sheley was accused of more than one murder. She was not aware of any details of the other crimes or how many other murders. After being questioned by the trial court and the parties, the juror stated she could disregard what she had heard and would decide on the evidence presented.

¶ 14      In all, Sheley used six peremptory challenge to excuse jurors who had knowledge of the other murders through pretrial publicity and for whom the trial court denied his challenges for cause. One venireperson who had other crimes knowledge was seated on the jury after Sheley declined to use a peremptory challenge. After using his sixth peremptory challenge, Sheley moved for additional peremptory challenges, arguing that the trial court's denial of his cause challenges for potential jurors who knew of the other crimes evidence required him to exhaust his peremptory challenges. While the motion was under advisement, Sheley used his final peremptory challenge. Thereafter, the trial court denied Sheley's motion for additional peremptories. Jury selection continued and one additional juror who had knowledge of the other murders was selected after the trial court denied Sheley's challenge for cause.

¶ 15      At the close of jury selection, Sheley moved for a mistrial and for a change of venue. He argued that the media coverage was extensive and unavoidable, and irreparably tainted the jury pool. The trial court denied Sheley's motion for a mistrial, finding that the jurors who were selected were impartial in spite of the pretrial publicity. It noted that the jury was seated in six days, a good time line in a high profile case. The trial court emphasized the potential jurors swore under oath they would set aside any opinions based on the pretrial publicity and would uphold the law and decide Sheley's guilt or innocence based on the evidence presented. The trial court also denied Sheley's motion for a change of venue as untimely. It explained that while Sheley's first motion for change of venue was premature, the subsequent motion was too late as the jury had been selected and the trial was poised to begin. The trial court noted that the appropriate period for the change of venue motion was during the period Sheley proceeded *pro se*.

¶ 16      The trial took place. The evidence established that Sheley stole a company truck from Illinois Oil Products in Rock Island the morning of June 28, 2008. He also took a workshirt, shorts and orange company hat from the Illinois Oil Products' facility. Video surveillance footage from a Mobil Mini Mart near Main Street in Galesburg showed Sheley in a blue workshirt and orange hat make a gas purchase around 8 p.m. and drive off in the Illinois Oil Products truck. Video footage from the HyVee grocery store and gas station showed the truck travel west on Main Street around 8 p.m. Randall's nephew saw his uncle in Randall's 2007 blue Chevy Silverado traveling east on Main Street also around 8 p.m. At 8:20, the video showed Randall's truck proceeding toward the back of the HyVee. Randall's body was later found next to a dumpster behind the HyVee. He died of massive blunt force trauma. Randall's truck reappeared on the tape at 8:25 p.m. and pulled into the HyVee gas station, where Sheley, wearing an orange hat and blue workshirt under a flannel shirt, made a purchase. The gas station clerk identified Sheley as the man in the video and stated that he was shaking and covered in blood.

¶ 17      Randall's blood was discovered in the gas station parking lot where Sheley had parked Randall's truck. It was also found on the pavement at the car wash. The Illinois Oil Products truck was recovered at the car wash. Beer bottles recovered from the truck contained Sheley's

fingerprints and deoxyribonucleic acid (DNA). Randall's truck was recovered on June 30, in St. Louis, Missouri. The passenger seat was soaked in Randall's blood. Items found in the truck contained Sheley's DNA and his fingerprints were on the driver's door handle and the steering wheel. Four witnesses saw Sheley in Festus, Missouri, on June 29; three said he was driving Randall's truck. Sheley was arrested in Granite City on July 1.

¶ 18    After introducing evidence that Sheley was born on July 31, 1979, and Randall was born on April 27, 1943, the State rested. The defense rested. The jury deliberated and found Sheley guilty on all counts. Sheley filed a motion for a new trial, arguing that the trial court erred in denying his challenges for cause for the jurors with knowledge of the other crimes. Sheley further argued that the trial court erred in denying his motion for a mistrial and for a change of venue after jury selection concluded. The motion was heard and denied. The trial court sentenced Sheley to terms of imprisonment of natural life, 30 years and 7 years. Sheley appealed.

¶ 19                                        ANALYSIS

¶ 20    The issue on appeal is whether Sheley was denied a fair trial by the trial court's rulings regarding pretrial publicity. Sheley argues that he was denied a fair trial for two reasons. First, he challenges the trial court's denial of his motions for a change of venue and for a mistrial in which Sheley argued the pretrial publicity had a prejudicial effect on the jury pool. Secondly, Sheley submits that the trial court erroneously denied his challenges for cause for jurors who had knowledge of the other murders he was alleged to have committed.

¶ 21    A defendant is entitled to a trial by an impartial jury. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. An impartial jury is "a jury capable and willing to decide the case solely on the evidence before it. [Citations.]" (Internal quotation marks omitted.) *People v. Kirchner*, 194 Ill. 2d 502, 528-29 (2000). There is no requirement that jurors be ignorant of the facts and exposure to pretrial publicity alone does not demonstrate prejudice. *Kirchner*, 194 Ill. 2d at 529. However, a juror must be able to set aside his opinions and decide the case solely on the evidence presented in court. *Kirchner*, 194 Ill. 2d at 529. There is no presumption of prejudice as a result of a juror's knowledge of pretrial publicity. *People v. Coleman*, 168 Ill. 2d 509, 547 (1995). When a juror states he is able to be impartial, he should be believed. *Coleman*, 168 Ill. 2d at 547-48.

¶ 22    There are some circumstances, however, where inflammatory pretrial publicity is so pervasive that the jurors cannot be impartial, regardless of their sincere claims to the contrary. *Coleman*, 168 Ill. 2d at 548. A defendant is entitled to a change of venue due to pretrial publicity where a reasonable apprehension exists that he cannot receive a fair and impartial trial. *People v. Little*, 335 Ill. App. 3d 1046, 1052 (2003). The best evidence of whether a fair and impartial jury can be chosen is the answers given by potential jurors during *voir dire*. *Little*, 335 Ill. App. 3d at 1054. A reviewing court must consider the entire record, including *voir dire*, in deciding a defendant's unfair trial claim. *Kirchner*, 194 Ill. 2d at 529. This court reviews a trial court's denials of a motion for change of venue and of challenges for cause during *voir dire* for an abuse of discretion. *People v. Sutherland*, 155 Ill. 2d 1, 14 (1992) (citing *People v. Allen*, 413 Ill. 69, 73-74 (1952)); see also *People v. Bowman*, 325 Ill. App. 3d 411, 422 (2001) (citing *People v. Ephraim*, 323 Ill. App. 3d 1097, 1104 (2001)).

¶ 23    The trial court denied Sheley's motions for change of venue on untimeliness grounds. It considered the first motion premature, finding that the existence of pretrial publicity did not

necessitate a change of venue at that time, noting that the trial date was remote. In fact, the trial did not begin for nearly two years after the opinion polls were taken. The trial court invited the defense to renew its motion at a later date if appropriate and anticipated that Sheley would again seek a venue change. Sheley filed a motion to change venue and for a mistrial after the jury was selected, which the trial court considered too late. The trial court instructed that the appropriate time for the motion was during the period from March to July 2011 when Sheley proceeded *pro se*. The trial court reiterated that *voir dire* would be the best indicator of whether a fair and impartial jury could be seated.

¶ 24       We find the trial court properly denied the change of venue motions as untimely. The first motion was filed and argued in 2009. The opinion polls were conducted one year after Sheley was alleged to have committed the crimes and nearly two years before the trial began. At the time the polls were conducted in June and October 2008, the crimes were fresh in the community's consciousness and passions were running high. The second motion was filed after *voir dire* was concluded and the jury was selected. The passage of time was reflected in the answers of many potential jurors, whose recollections of the crimes, if any, were vague and inaccurate. The record does not support the conclusion that the publicity was so widespread and prejudicial that the venire remained biased in spite of potential jurors' claims that they were not partial.

¶ 25       Results of *voir dire* established that a fair and impartial jury was seated in spite of the pretrial publicity. The trial court took specific steps to ensure that an unbiased jury was selected. On the agreed suggestion of the parties, a jury questionnaire they created was disseminated to the jury pool prior to questioning. In addition to the questionnaire, the parties were allowed unlimited time to question the potential jurors. The jurors were questioned individually, rather than by the trial court's standard practice of questioning in panels. The trial court, State, and defense participated in extensive *voir dire*, with potential jurors being questioned for substantial periods of time. Each potential juror was asked numerous questions about their knowledge of the case, including the specifics of media exposure.

¶ 26       *Voir dire* lasted six days. Questioning of the first 64 people resulted in 40 dismissals for cause and the parties exercised their full 14 peremptory challenges. After the 12-person jury was empaneled, *voir dire* continued, another 33 potential jurors were questioned, resulting in a final panel of four alternate jurors. The trial court noted that the chosen jurors accepted the seriousness of their duty and each vowed to set aside any extraneous information or opinions he or she knew or held about the case. After our review of the record, including *voir dire*, we are satisfied that the trial court seated a fair and impartial jury. We find that the trial court did not abuse its discretion in denying Sheley's motion for a mistrial and change of venue.

¶ 27       Sheley also argues that the trial court improperly denied several of his challenges for cause, resulting in the exhaustion of his peremptory challenges and the seating of several jurors with knowledge of the inadmissible other murders. He maintains that the trial court's cause denials were inconsistent with its ruling on Sheley's motion *in limine* to exclude evidence of the other murders because the information was too prejudicial. Sheley rejects the trial court's conclusion that the selected jurors could set aside the other crimes knowledge, and relies on *People v. Taylor*, 101 Ill. 2d 377 (1984), to support his claim that the pervasive pretrial publicity irreversibly tainted the jury pool.

¶ 28       In *Taylor*, the defendant argued on appeal that he was denied a fair trial by the seating of a biased jury. *Taylor*, 101 Ill. 2d at 385-86. Information had been widely publicized that a

codefendant had been released and charges dropped after he passed a polygraph test and that Taylor remained in custody after failing the test. *Taylor*, 101 Ill. 2d at 383-84. The *Taylor* court found it significant that the publicized information concerned polygraph results, which carried with it the possibility that jurors would assume the test was reliable to the prejudice of the defendant. *Taylor*, 101 Ill. 2d at 391-92. The court reasoned that because lie detector tests are inadmissible in Illinois, exposure to the information that the codefendant passed and the defendant did not pass was sufficient to raise the presumption of partiality. *Taylor*, 101 Ill. 2d at 393. The *Taylor* court described the polygraph results as "peculiarly persuasive material" and held that the trial court erred in denying the defendant's challenges for cause for the jurors who had knowledge of the polygraph tests. *Taylor*, 101 Ill. 2d at 395-96.

¶ 29    Here, it is undisputed that there was extensive media coverage of Sheley's case, from the initial murders through the trial. As many of the potential jurors stated, information and discussion about the case were widespread in the small, rural Galesburg community. The majority of the potential jurors questioned had heard or read something about the case at some point. Most had vague recollections and were unable to offer substantial facts about the case. Forty out of sixty-four potential jurors were excused for cause; seventeen were excused because they were arguably biased from media exposure and twenty-three were excused for other reasons. The defense exercised six peremptory challenges on potential jurors who knew of the other murders from the pretrial publicity. Of the jurors who were seated, three had information about the other murders, but all three stated they would decide the case based on the evidence presented. Juror Kraus specified that Sheley was "accused" of the other murders and that he did not have the facts to form an opinion regarding Sheley's guilt. Harris, the second juror with other crimes knowledge, had incorrect information that would be contradicted in total by the facts at trial. The third juror, Donnelly, was aware that there was a series of murders but had no opinion regarding Sheley's guilt. The trial court and parties extensively questioned these jurors and the trial court was assured that they would set aside any bias and decide on the evidence presented.

¶ 30    Based on our review of the *voir dire*, we find the trial court's conclusion supported by the record. The trial court properly distinguished the jurors' other crimes knowledge from the polygraph information found prejudicial in *Taylor*. As noted above, polygraph evidence is never admissible in Illinois courts, while other crimes evidence may be admissible. Indeed, the trial court allowed evidence of the first murder that Sheley was alleged to have committed in Sterling as part of a course of conduct bringing him to Galesburg, where he killed the instant victim, Randall. The other crimes evidence of which the three jurors were aware did not create a direct inference of Sheley's guilt, unlike the polygraph results at issue in *Taylor*. Moreover, after distinguishing the peculiar nature of the polygraph evidence, the *Taylor* court reiterated that the general test is whether the defendant in fact received a fair trial. *Taylor*, 101 Ill. 2d at 396. *Voir dire* is a "significant tool" in determining whether a potential juror can set aside any biases and make a determination on the evidence presented. *Taylor*, 101 Ill. 2d at 398. Here, the record, including *voir dire*, established that an unbiased jury was seated and Sheley received a fair trial. Accordingly, we find the trial court properly denied Sheley's motion for a new trial.

¶ 31    For the foregoing reasons, the judgment of the circuit court of Knox County is affirmed.

¶ 32    Affirmed.