THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM E. FRIDAY, Defendant-Appellant.

Fourth District   No. 4—91—0832

Opinion filed August 6, 1992.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Scott H. Walden, State's Attorney, of Quincy (Norbert J. Goetten, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

On October 3, 1991, following a jury trial in the circuit court of Adams County, defendant William E. Friday was convicted of four counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)) and one count of attempt (robbery) (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4(a), 18—1(a)). He was subsequently sentenced to concurrent terms of 45 years' imprisonment for one count of murder and five years' imprisonment for the attempt (robbery) conviction.

On appeal, defendant maintains (1) the trial court abused its discretion in denying his motion for a change of venue based upon adverse pretrial publicity; (2) the trial court erred in precluding him from presenting independent evidence which would establish the bias of the State's witnesses; (3) defense counsel's failure to cross-examine occurrence witnesses as to the cause of a fire to establish bias constituted ineffective assistance of counsel; (4) the trial court erred in refusing his instructions on involuntary manslaughter; and (5) the trial court improperly reserved judgment on three counts of murder. We affirm in part and reverse in part.

Defendant was charged with four counts of murder for the beating death of Earl Bundy, Sr., at the home of Carla Williams, and with one count each of attempt (robbery) and unlawful restraint. The unlawful restraint charge was dismissed prior to trial. Johnny Presley was originally charged as a codefendant, but the cases were severed. Following a jury trial, Presley was convicted of murder on July 25, 1991. He was subsequently sentenced to 75 years' imprisonment.

As the sufficiency of the evidence to support the verdict is not questioned, only a very brief summary of the evidence is necessary for an understanding of the issues. The principal evidence for the prosecution was provided by occurrence witnesses: (1) Connie Manus, a 13 year old, (2) Anthony Black, a 24 year old who had a hearing impairment and had consumed 12 to 18 glasses of beer and some marijuana on the evening of the killing, and (3) Cynthia Gredell. They, together with defendant, Presley, Williams, the decedent Bundy, and others were eventually gathered at Williams' home on the evening of April 13, 1991.

According to the composite testimony of those three eyewitnesses, the following chain of events occurred: (1) Bundy and Williams went into Williams' bedroom; (2) Williams lay down on a bed, and Bundy got on top of her attempting to remove her clothing; (3) Presley responded to Williams' call for help and knocked Bundy backward into a headboard of the bed; (4) Presley continued to hit Bundy on the chin; (5) during the course of this, defendant had entered the bedroom and grabbed Bundy's wallet; and (6) defendant remained in the bedroom while Presley continued to batter Bundy. According to Gredell, she saw defendant hit Bundy once during the time Presley was attacking Bundy.

According to the witness Black, when he came into the bedroom and told Presley to stop hitting Bundy, two voices told him to leave. Undisputedly, Presley inserted a mop handle into the anus of Bundy. The evidence was undisputed that eventually defendant went with

Presley as they removed Bundy's body from the Williams house, placed it in an automobile, and drove the automobile to the Mississippi River where the automobile was permitted to run into the river with Bundy's body in it. Sometime that night, after Presley and defendant left Williams' house with Bundy's body, the Williams house burned, and Williams and two of her three children died in the fire.

Defendant admitted he had been in Williams' bedroom while Presley was hitting Bundy, but stated that he stayed because Presley threatened him if he did not do so. Defendant maintained he asked Presley to stop hitting Bundy, but Presley continued. He denied he took Bundy's wallet but admitted he helped Presley dispose of the body.

At the hearing on defendant's motion for change of venue, defense counsel presented copies of 25 articles which had appeared in a local newspaper between the time of the offense (April 13, 1991), and the date of defendant's motion (August 12, 1991). He argued that area radio and television stations had also reported extensively, and in detail, the stories of Earl Bundy's death, the arrest and trial of the other defendant, and of the fire which destroyed Williams' house shortly after the beating. He did not offer proof of either the scope or content of the coverage by radio or television or the percentage of the population of the area that was reached or served by either the newspaper, radio or television.

Counsel also presented the results of a poll he conducted of 50 individuals based upon "past jury venires." The poll indicated (1) 98% of the polled individuals had heard or read of the murder charges pending against defendant and Presley; (2) 86% had heard or read that Bundy was beaten; (3) 50% had heard Bundy was robbed; (4) 88% had heard Bundy was sodomized with a broom handle; (5) 94% had heard he was placed in the trunk of a car that was pushed into the Mississippi River; (6) 72% had heard one of the defendants had already been convicted of the murder; (7) 52% had already formed an opinion or belief that the other defendant was also guilty of murder; and (8) 6% indicated that although they had an opinion or belief as to the guilt or innocence of the untried defendant, they refused to give an answer which might lead to a changed venue. Defense counsel noted that a poll conducted by the State resulted in the State's conclusion that 33% of the people surveyed could not be fair and impartial in rendering a verdict. No evidence was presented of the scientific accuracy of either survey.

Defendant notes the general population of Adams County is 71,622. The articles defendant has included in the record are all from

the *Quincy Herald-Whig.* Of the 25 articles, three were primarily about codefendant Presley, three made no mention of defendant at all, and one article was about the public defender's caseload and said only that defense counsel had recently been assigned his first murder case. That article did not mention defendant's name. One article was about an arson in Hannibal and was apparently included because the victim of that arson was a "foster sister" of Presley. That article also did not mention defendant. Finally, although most of the articles gave some description of the beating, murder, fire or finding the body in the river, only five articles gave specific details of the murder.

Defendant notes two local television stations and area radio stations reported the charges, the evidentiary hearings held prior to trial and all proceedings of Presley's trial. Defendant maintains the "clear picture" emerging from the publicity is that the community was predisposed as to defendant's guilt, and it was virtually impossible for him to receive a fair trial.

The instant case is similar to *People v. Hines* (1988), 165 Ill. App. 3d 289, 518 N.E.2d 1362, decided by this court. There, as here, a murder took place in a somewhat rural area, and the local newspapers and television stations provided extensive coverage. That defendant's request for change of venue was denied. A public opinion poll conducted in that case indicated that out of 287 people surveyed, 81% knew of the case by name, 73% thought the police had arrested the right people and 64% believed those arrested were guilty. Over half of those polled had heard of the case 25 times or more and could name the people charged with the crimes. This court noted that although some of the news articles relayed emotion-packed stories of the deceased and her family, most dealt only with the factual circumstances surrounding the incident and subsequent trials. This court concluded that the trial court's denial of defendant's motion for change of venue did not deprive defendant of a fair trial.

Similarly here, although defendant's survey showed that a large portion of the 50 people surveyed were familiar with the case, such an awareness or familiarity is not a basis for change of venue, since there is no requirement that jurors be totally ignorant of the case. (*People v. Sanchez* (1986), 115 Ill. 2d 238, 263, 503 N.E.2d 277, 285; *People v. Dall* (1991), 207 Ill. App. 3d 508, 529, 565 N.E.2d 1360, 1372.) We cannot say the 25 newspaper articles included in the record and the unknown number of television and radio broadcasts so "saturated" the community that defendant was unable to receive a fair trial. There were no editorials denouncing defendant or calling for his conviction, the articles gave factual descriptions of the crime, the pro-

gress in court, and the coverage of Presley's trial, but they did not give unduly graphic details of the murder.

Defendant contends the trial court denied his motion because it erroneously believed that so long as the jurors could state under oath that they would disregard anything they may have read and lay aside any preconception, and did not state fixed opinions, defendant would receive a fair trial. Defendant also maintains the trial court did not consider the "powerful nature" of the information to which the jurors were exposed. Defendant cites *People v. Taylor* (1984), 101 Ill. 2d 377, 462 N.E.2d 478, where the jurors learned the defendant had failed a polygraph test, while a codefendant who was released had passed. The supreme court determined that exposure to such highly inflammatory material was enough to disqualify the venire.

Defendant maintains that here the pretrial publicity concerning the beating, sodomizing, and enclosure of the victim in the trunk of his own car, the submerging of that car in the Mississippi River and the destruction of the crime scene by a fire which killed three people, including two small children, had such a great psychological impact on the jurors that they could not be fair and impartial, despite their statements that they could. Defendant notes many potential jurors were discharged because they knew some of the witnesses, the State's Attorney, or had seen the body being recovered from the river. He further notes that several of the jurors actually impanelled knew witnesses. He concludes the trial court's denial of his motion for change of venue resulted in an unfair trial.

Here, of the 44 jurors examined, only four were excused for cause on the basis that they had formed an opinion of the case or would have difficulty setting aside what they had read or heard. The defendant used four peremptory challenges to excuse potential jurors who had limited or no knowledge of the case and a fifth challenge to excuse a potential juror who had heard of the case but could not recall what he had heard and said he could set aside what he had heard. The 14 jurors finally selected had all heard or read about the case, but all stated they could set aside what they had heard or read and decide the case based solely on the evidence at trial.

Of the 14 jurors, six, including the two alternates, said they either knew little, knew "bits and pieces" or could not recall in any detail what they had heard or read. Only two jurors said they had read part of an article about the case which appeared the prior weekend, and both said that nothing included in the article would "tip the scale" or make anyone start at a disadvantage. Five jurors had not read the

most recent article, and three members of the venire did not subscribe to the *Quincy Herald-Whig.*

The record demonstrates that, while there was a general awareness of the case in the venire, only four people had formed an opinion about the defendant's guilt or innocence which they could not set aside, and they were dismissed for cause. Of the 14 jurors selected to hear the case, no one indicated he or she had formed an opinion as to defendant's guilt or innocence, and all 14 of the jurors said they could set aside anything they had heard about the case in the news media.

A reviewing court must evaluate the *voir dire* of the jurors in determining whether defendant received a fair trial. (*Sanchez*, 115 Ill. 2d at 263, 503 N.E.2d at 285.) The record as a whole must establish more than just a potential for bias. In addition, the court may consider that a defendant did not exhaust his peremptory challenges. *Dall*, 207 Ill. App. 3d at 529, 565 N.E.2d at 1372.

Here, defendant did not exercise all his peremptory challenges and he used four such challenges to excuse potential jurors with little or no knowledge of the case and who stated they could set aside what they had heard. Defendant accepted jurors with greater knowledge or exposure to media coverage, including two who had read part of the most recent article about the case. Although these factors are not conclusive, they tend to rebut an allegation of bias. *Sanchez*, 115 Ill. 2d at 265, 503 N.E.2d at 286.

Finally, we note the trial court appeared to have taken steps to insure defendant was able to receive a fair and impartial jury. The potential jurors were questioned in panels of four to limit the number of people who might be influenced by any opinions or statements made by other potential jurors, and the trial court stressed that the jurors should be able to set aside anything they had heard or read and decide the case based upon the facts presented in court. The jurors were extensively questioned about the burden of proof, the presumption of innocence and their ability to be fair and impartial.

Defendant relies primarily upon the cases of *Rideau v. Louisiana* (1963), 373 U.S. 723, 10 L. Ed. 2d 663, 83 S. Ct. 1417, and *Coleman v. Kemp* (11th Cir. 1985), 778 F.2d 1487, and maintains that even if actual prejudice is not shown, prejudice should be presumed under the circumstances here. The Illinois Supreme Court has never adopted such an analysis of determining whether a change of place of trial is required in a criminal case because of advance publicity. The *Rideau* court did not set forth such an analysis. There, the community of the trial had witnessed a televised confession by the defendant to the offense. The totality of the prejudice under those circumstances re-

quired a change of venue. *Coleman* is not binding on us and, in any event, the saturation of pretrial publicity was much greater there than that here.

The appropriate analysis for us to make is to consider both the *voir dire* of the jurors together with the rest of the record to determine whether the court erred in denying a change of venue. (*Sanchez*, 115 Ill. 2d at 263, 503 N.E.2d at 285; *Taylor*, 101 Ill. 2d at 390-91, 462 N.E.2d at 487.) Having followed that guideline, we conclude the circuit court did not err in denying defendant's motion for changing the place of trial.

Defendant next argues he was deprived of a fair trial because the trial court refused to allow defendant to present extrinsic evidence concerning the cause of a fire which had occurred subsequent to the homicide and which destroyed the scene of the crime. Defendant argues he was denied the right to present a defense by the limitation on his presentation of evidence that the occurrence witnesses were biased against him and had started the fire to cover up their own involvement in the beating death of Earl Bundy. Defendant further contends his attorney's failure to cross-examine the witnesses regarding the origin of the fire constituted ineffective assistance of counsel.

Prior to trial, the State filed a motion *in limine* seeking to preclude the defense from cross-examining the State's three occurrence witnesses, Connie Manus, Cindy Gredell, and Tony Black, concerning the origin or cause of the fire at Carla Williams' house shortly after the murder. Defendant argued that he should be allowed to introduce evidence that the fire killed Carla Williams and two of her three small children, that the three occurrence witnesses allegedly sat on the front porch of the house and did not notice it was engulfed in flames until a four-year-old child in the house screamed, that the fire was determined to be caused by arson, and finally, that the witnesses initially provided false information to fire investigators. The court ruled the defendant could cross-examine the three witnesses as to the origin of the fire, including the possibility that those witnesses had started the fire. The court reserved ruling on the extent to which the defense could present independent evidence of the cause of the fire and ordered that defendant seek leave to introduce any such evidence before presenting the evidence in front of the jury. During trial, the court ruled that independent proof of the cause of the fire was not admissible.

During the presentation of the State's evidence, Gredell, Black and Manus gave similar accounts of Bundy's death. Gredell and Black indicated they had spent the evening with defendant, Bundy, Wil-

liams, and codefendant Presley at various bars and they all had become intoxicated. All three witnesses described the beating of Bundy which apparently resulted from Bundy's sexual attack of Carla Williams. The witnesses implicated both defendant and Presley.

Defense counsel did not cross-examine the witnesses as to the cause of the fire. Counsel told the court he wished to present direct evidence as to the multiple points of origin of the fire. He noted the State's evidence tended to show the only entrance to the house was an open door leading from the front porch into the living room. All three witnesses testified they had been sitting on the porch and did not smell smoke or notice the fire until four-year-old Marcus Williams screamed. When they went into the house it was filled with smoke and flames. Counsel argued it would have been impossible for the fire to have gotten to that point without the witnesses noticing it. He also argued that the four-year-old child told conflicting stories about the origin of the fire, telling the police first that he had started a pillow on fire and later telling his grandmother that Manus or Gredell or both had started the fire.

Counsel sought leave to impeach the three occurrence witnesses' credibility and to present the theory that they had conspired to incriminate the defendant. He argues the fire's origin was relevant, because the fire destroyed evidence of the crime, and the witnesses' reason for testifying falsely was to exculpate themselves regarding Bundy's death and the deaths of the Williams family. The trial court noted that showing "interest" or "bias" is not impeachment. The court determined the evidence of the cause of the fire was highly speculative and would have required a mini-trial to establish whether it was relevant.

The bias of a witness is always relevant in discrediting a witness and affecting the weight to be given his testimony. (*Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105; *People v. Davis* (1990), 193 Ill. App. 3d 1001, 1004, 550 N.E.2d 677, 679.) The trial court should give the widest latitude to the defense in attempting to establish bias or motive. (*People v. Wilkerson* (1981), 87 Ill. 2d 151, 429 N.E.2d 526.) Nevertheless, a trial court may exercise its discretion in precluding evidence to show bias that is too remote or uncertain. (*Davis*, 193 Ill. App. 3d at 1004, 550 N.E.2d at 679.) The court's decision will not be disturbed on review absent a finding of "clear abuse of discretion resulting in manifest prejudice." *Davis*, 193 Ill. App. 3d at 1005, 550 N.E.2d at 679.

Here, the trial court determined defendant's offer of proof did not support a theory of conspiracy either among the three occurrence wit-

nesses or between one or more of them and defendant or Presley. The court noted that no evidence had been presented to support the theory that any of the witnesses had caused the fire. Rather, the court noted, the evidence showed the contrary: the witnesses were all close to the occupants of the house who died in the fire. Manus, the babysitter, had been babysitting for the children for more than a year. Gredell and Black were close personal friends of Carla Williams, and Black risked his life, according to the testimony, to try to save them. The court also noted that Kathleen Gravitt testified Presley and Friday came to her house, located within 1½ blocks of the scene of the fire, between approximately 5:30 or 6 a.m. on the morning of April 14, and it could be argued defendant had been involved in the fire. The court concluded that no one had been charged with setting the fire, and it would be inappropriate to try such a case which was not before the court.

■■ The trial court properly exercised its discretion in precluding defendant from presenting evidence as to the cause of the fire. He made no attempt to present testimony from any individual with direct knowledge of the cause of the fire. In addition, the testimony that the child accused different people of starting the fire at different times was not admissible as a spontaneous declaration, since he had previously given statements to a fireman at the scene and to a police officer indicating he had started the fire. Those earlier reports would destroy the spontaneity of any statement the child made to family members. (*People v. Robinson* (1978), 73 Ill. 2d 192, 383 N.E.2d 164.) Any inference or proof of bias arising from the allegation the witnesses had started the fire was not direct and was too remote and speculative to be admissible.

Further, defense counsel was not ineffective for failing to cross-examine the witnesses as to the fire's origin. In order to prove ineffective assistance of counsel, a defendant must show (1) that despite a strong presumption of counsel's professional competence, counsel's allegedly unprofessional acts or omissions were so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the sixth amendment; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.

■■ Here, defense counsel chose to forego cross-examination of the witnesses as to the origin of the fire. Questions of trial strategy will not be subject to second-guessing, and reviewing courts are to give trial counsel wide latitude in making tactical decisions. (*Strick-*

*land,* 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) The failure to cross-examine the witnesses as to the cause of the fire did not amount to incompetence. Defendant points to no evidence which would indicate such questioning would be likely to produce evidence which would be helpful to defendant, and cross-examination was unlikely to produce a confession that any of the witnesses started the fire to cover up their own involvement in Bundy's death. Further, since the pretrial discussion of the admissibility of the evidence concerning the fire's origin indicated that Manus had stated to police that defendant told Gredell to remove the evidence, the cross-examination of Manus could have been extremely damaging to defendant.

Finally, even if counsel's failure to cross-examine the witnesses was so serious as to be incompetence of counsel under the constitution, it is unlikely that the alleged error would have affected the outcome of the trial. The jury was aware of the witnesses' intoxication at the time of the incident, their acquiescence in the beating, Black's fear of being prosecuted, their failure to report the incident, their unusual behavior in returning to the scene of the incident and sitting on the porch in the early morning hours after the beating, and the fact that the fire started shortly after the murder and destroyed evidence of that crime. Even without direct testimony, the jury could have questioned the witnesses' credibility.

In addition, the jury had strong evidence of defendant's involvement in the beating. He admitted he was present; he did not take advantage of numerous opportunities to leave; he did not stop the beating; he obeyed Presley's instructions to keep everyone out of the bedroom, and he helped to drive the car to the river with Bundy's body in the trunk. Defendant's testimony thus corroborated the testimony of the three State's witnesses regarding the beating. Under these circumstances, and since defendant was tried under an accountability theory of murder, evidence that the witnesses may have started the fire after the murder was unlikely to change the outcome of the trial. Defendant was not deprived of a fair trial by his counsel's failure to cross-examine the witnesses to show their bias.

Defendant next argues the trial court erred in refusing to instruct the jury on involuntary manslaughter. Defendant maintains the evidence that Bundy had been beaten by a codefendant who was intoxicated is some evidence of recklessness which would entitle him to the instruction. The charges against him alleged defendant beat Bundy and either intended or knowingly caused great bodily harm or death. He was also charged with felony murder based upon the alleged attempt to rob Bundy.

A person acts intentionally when his conscious objective or purpose is to accomplish the result or engage in the conduct proscribed. (Ill. Rev. Stat. 1989, ch. 38, par. 4—4.) A person is guilty of involuntary manslaughter if he unintentionally kills an individual without justification and if:

> "his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." Ill. Rev. Stat. 1989, ch. 38, par. 9—3(a).

"Recklessness" is defined by section 4—6 of the Criminal Code of 1961, which states:

> "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Ill. Rev. Stat. 1989, ch. 38, par. 4—6.

Defendant notes that only " 'very slight evidence upon a given theory of a case will justify the giving of an instruction.' " (*People v. Everette* (1990), 141 Ill. 2d 147, 157, 565 N.E.2d 1295, 1299, quoting *People v. Bratcher* (1976), 63 Ill. 2d 534, 540, 349 N.E.2d 31, 34.) A defendant charged with murder is, however, entitled to an instruction on involuntary manslaughter only where there is evidence before the jury which would reduce the offense from murder to involuntary manslaughter. No instruction on the lesser offense should be given where the evidence clearly shows the homicide was murder. *People v. Foster* (1987), 119 Ill. 2d 69, 87, 518 N.E.2d 82, 89.

Defendant argues here the involuntary manslaughter defense was supported by the evidence. He maintains the evidence provided as follows: (1) only one of the three occurrence witnesses claimed to see defendant strike the victim; (2) Gredell claimed that defendant used his hand to hit Bundy once; (3) Gredell also testified defendant kicked Bundy once, but she admitted she did not see any foot contact; (4) all the other blows, including the fatal blow to the front of the neck, were inflicted by Presley; (5) there was some evidence defendant told Presley to stop hitting Bundy; and (6) although Presley struck the victim on the back and buttocks with a mop handle, this was not the cause of death and was consistent with recklessness.

Defendant contends the fact that neither defendant nor Presley used a gun or a knife demonstrates a lack of intent to kill. (*People v. Deason* (1991), 223 Ill. App. 3d 320, 584 N.E.2d 829.) In *Deason*, this

court determined that "beating another person with a baseball bat does not have nearly the evidentiary value of an intent to kill that firing a gun at a person does." (*Deason*, 223 Ill. App. 3d at 326-27, 584 N.E.2d at 834.) That court noted a jury could conclude that a beating, even one as severe as was administered there, would not be as certain to cause the death of the victim as would the use of a gun to shoot or a knife to stab him. Finally, defendant notes the victim, two of the witnesses, and both defendant and the codefendant were all intoxicated. He argues this is further evidence of the existence of recklessness in support of involuntary manslaughter.

This case is unlike the factual situation in *Deason*. There, that defendant and a codefendant went to the victim's house in the middle of the night to "get[ ] some money." (*Deason*, 223 Ill. App. 3d at 322, 584 N.E.2d at 831.) While they were in the house, the codefendant hit the victim one time in the face with a baseball bat. That defendant said she heard something being hit that sounded " 'like someone hitting a large bag of fluid.' " *Deason*, 223 Ill. App. 3d at 322, 584 N.E.2d at 831.

■■ Here, defendant's act of robbery in taking Bundy's wallet, thus giving rise to the felony-murder conviction, was clearly not done recklessly nor were any acts making defendant guilty by accountability. Presley's continued beating of Bundy and his use of the mop handle were clearly not done recklessly. Nothing in defendant's own testimony or arising from the circumstances of the occasion indicates that if defendant struck the blow which Gredell said he did, defendant was merely acting recklessly then. The fact that defendant was likely intoxicated throughout the episode resulting in Bundy's death did not require the court to give an instruction of the offense of involuntary manslaughter.

■■ As we have indicated, after receiving the verdict, the court ultimately entered judgment on only one of the murder counts, count IV, charging felony murder and reserved the question of entry of judgment as to the other murder counts. The logical reason for the court to attempt to do this was because the judgment on count IV might be set aside on review and the failure to reserve entry of judgment as to the other counts might be held to constitute an acquittal as to those counts. We need not pass upon the effect of this strategy. The State concedes that the reservation of the entry of judgment on the verdict on the other murder counts cannot stand. The case of *People v. Guest* (1986), 115 Ill. 2d 72, 104, 503 N.E.2d 255, 269, is cited. We agree that the portion of the judgment reserving entry of judgment as to the other murder counts must now be stricken.

Accordingly, we affirm the judgment of conviction and sentence imposed but reverse the portion of the judgment reserving entry of judgment on other counts where guilt of murder was found by the jury. We remand to the circuit court of Adams County for the sole purpose of having the portion of the judgment which is reversed stricken.

Affirmed in part; reversed in part, and remanded with directions.

STEIGMANN and LUND, JJ., concur.