THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
HERSCHEL JOSEPH PLACE, Defendant-Appellant.

Fourth District   No. 4—91—0942

Opinion filed December 17, 1992.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Brett Irving, State's Attorney, of Pittsfield (Norbert J. Goetten, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

On November 11, 1991, following a jury trial in the circuit court of Pike County, defendant Herschel Joseph Place was convicted of first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(1)), attempt (first degree murder) (Ill. Rev. Stat. 1991, ch. 38, par. 8—4(a)), and two counts of armed violence (Ill. Rev. Stat. 1991, ch. 38, par. 33A—2). He was subsequently sentenced to concurrent terms of 25 years' imprisonment for first degree murder and 15 years' imprisonment for attempt (first degree murder). Defendant was not sentenced on the two armed violence convictions.

On appeal, defendant contends the trial court abused its discretion by (1) denying his motion for a change of venue based on adverse publicity, and (2) granting the State's motion *in limine* preventing defendant from offering any evidence regarding whether he suffered from post-traumatic stress disorder (PTSD). In addition, defendant contends the court erred in sentencing by considering as a factor in aggravation that his conduct caused serious harm, and ordering him to pay restitution within 12 months of his release from the Department of Corrections. We affirm in part and reverse in part.

Defendant was originally charged with the offenses of first degree murder and armed violence for the shooting death of Steve Howland. In addition, defendant was charged with the offenses of attempt (first degree murder), armed violence, and two counts of aggravated battery for shooting and injuring James McDowell. Prior to trial the court granted the State's motion to nol-pros the two counts of aggravated battery. Following a trial on September 13, 1991, the court entered an order declaring a mistrial after the jury was unable to reach a verdict. Subsequently, defendant was tried a second time and convicted on all counts.

Defendant does not challenge the sufficiency of the evidence supporting the convictions; therefore, only a brief summary of the evidence is necessary for an understanding of the issues. The evidence adduced at trial established that on October 8, 1990, defendant was at the Black Lantern Tavern located in Barry. Defendant arrived at the tavern at approximately 8:30 a.m. and indisputably continued to drink from approximately 10 a.m. until 4:30 p.m., at which time the shootings occurred. The victims, Howland and McDowell, arrived at the tavern somewhere between 9 a.m. and 11 a.m., and they too drank continuously until the time of the shootings. The bar at the tavern was shaped like an L, and throughout the day defendant was seated in the middle of the long side of the L, and the victims were seated at the short side of the L. There were other patrons also seated at the bar that day. Numerous witnesses to the shootings testified at the trial, as well as the complaining witness McDowell, and defendant.

McDowell testified regarding the shootings at the Black Lantern Tavern as follows: (1) around 10:30 a.m. defendant said "something about a 965" (the local union) and using offensive language he responded to defendant indicating he disliked "965"; (2) he believed defendant kept *glaring* at the end of the bar where he was seated and at approximately 3:30 p.m. or 4 p.m. he approached defendant and "asked [defendant] if he had something on his mind that he had glared down there, if there was a problem [he would] like to know

what it was, and [defendant] said, No, go away and [leave] him alone"; (3) he then returned to where he was seated and stepped behind Steve Howland to hear what another person was saying; (4) he then heard "a crack like a loud firecracker and [he] looked down, and [Howland] was humped over, and [he] looked down, and there was defendant with a gun pointed that direction, and [defendant] said McDowell *** I'm going to kill you"; (5) he grabbed a barstool, using it to attack defendant, and he and defendant wrestled over the gun; (6) he got shot in the head twice but was able to take the gun from defendant; and (7) he threw the gun on the floor.

Defendant testified as follows: (1) he did not intend to harm Howland; (2) he does not know if he killed Howland at the Black Lantern Tavern; (3) he had known McDowell for four to five years; (4) on the day of the shootings he did not intend to harm McDowell; (5) he did not dislike McDowell; (6) he did not remember hurting anyone at the tavern; (7) he joined the Army and later served in Vietnam; (8) he was involved in combat in Vietnam and operated a bulldozer there to cut down trees; (9) he had a close friend in Vietnam who was killed in combat; (10) he was very much bothered by the loss of his friend; (11) he remained bothered from the loss of his friend after leaving the military, which manifested in nightmares, particularly each fall, which was the time of year his friend was killed; (12) he did not recall thinking of his friend who died in Vietnam on October 8, 1990, but he heard he had mentioned his friend's name after the shootings; (13) he consumed a lot of alcohol in Vietnam; (14) he has been drinking alcohol after work for the last 20 years and the amount of his consumption of alcohol has been increasing; and (15) on the day of the shootings he consumed 15 to 20 or more beers.

Defendant further testified that the last thing he remembered prior to the shootings was drinking a shot of whiskey and several beers. The next thing he remembered was getting off the floor after wrestling with McDowell. Defendant stated both he and McDowell had blood all over them. He picked his glasses off the floor and noticed his pistol lying against the wall and picked it up and laid it on the bar. Defendant testified he then asked Charlotte Brown, who was standing there, what had happened and she said "I think you just shot a guy." Brown then helped defendant make a phone call to his brother.

Various witnesses testified they either heard a gunshot coming from defendant's direction or saw defendant standing with a gun in his hand pointing toward where Howland was seated. Steven Colburn testified that approximately 10 to 14 days before the shootings he saw

a loaded .22 caliber handgun in the glove compartment of defendant's car. Deputy sheriff Chris Dolbeare testified that in the squad car en route to the hospital defendant stated that he had gotten into a fight with McDowell, but denied getting a gun from his car or touching the gun used in the shootings prior to finding it on the floor and placing it on the bar. Defendant had several expert witnesses testify establishing he had a 0.23 blood-alcohol content following the shootings, and that he had been an alcoholic for 20 years and had experienced alcoholic "blackouts."

Initially, defendant maintains the court erred in denying his pretrial motion for change of venue. The motion asserted that the inhabitants of Pike County were prejudiced against him to such a degree that he could not receive a fair trial in Pike County. In particular, the motion advanced that defendant believed "that many people in the county [knew] the facts of this case and that they believe[d] that [he] did shoot a firearm on October 8, 1990, which caused the death of Steve Howland and caused the injuries to James McDowell," and that this prejudice first became known to him on September 9, 1991. In support, defendant attached to the motion the affidavits of approximately 103 citizens of Pike County. The contents of all the attached affidavits were identical, and stated as follows:

"The undersigned, being first duly sworn, deposes and says that he or she is a reputable person and is now and has been for at least one year past an actual resident of Pike County *** [and that the] affiant believes that the inhabitants of said Pike County are so prejudiced against [defendant] *** that [d]efendant cannot have a fair and impartial trial in this court."

Initially, at the hearing on the motion for change of venue the court granted the State's motion to strike 46 unnotarized affidavits signed by Pike County citizens. The court denied the State's motion to strike the remaining 57 notarized affidavits as conclusory, and noted that although the affidavits were "broad and general *** they [had] some relevance." The court also noted that it had reviewed the newspaper articles regarding the case. In support of the motion, defense counsel primarily argued that the affidavits were based on the affiants' belief that due to the many witnesses of the shootings much prejudicial information, allegedly false, had spread by word of mouth throughout Pike County. The court denied the motion acknowledging "the difficulties in a small community of picking a jury on a high visibility case." However, the court concluded that defendant's right to a fair and impartial jury would be sufficiently protected by limiting *voir dire* to questioning panels of four potential jurors. The court also con-

cluded that despite the adverse publicity, potential impartial jurors could be found in Pike County, outside of the community of Barry, where the shootings occurred.

■ Defendant maintains that the instant case warrants the application of the "presumed prejudice standard" based on the allegedly extensive adverse pretrial publicity pervading the small rural community of Barry and the rest of Pike County. Defendant raises the "presumed prejudice standard" relying on *Rideau v. Louisiana* (1963), 373 U.S. 723, 10 L. Ed. 2d 663, 83 S. Ct. 1417, and *Coleman v. Kemp* (11th Cir. 1985), 778 F.2d 1487. However, this court in the recent decision of *People v. Friday* (1992), 232 Ill. App. 3d 1047, 1054, 598 N.E.2d 302, 307, rejected the contention that the United States Supreme Court in *Rideau* set forth a "presumed prejudice standard" in cases involving pervasive adverse pretrial publicity. Instead, the *Friday* court held that "[t]he appropriate analysis for us to make is to consider both the *voir dire* of the jurors together with the rest of the record to determine whether the court erred in denying a change of venue." *Friday*, 232 Ill. App. 3d at 1055, 598 N.E.2d at 307, citing *People v. Sanchez* (1986), 115 Ill. 2d 238, 263, 503 N.E.2d 277, 285; see also *People v. Taylor* (1984), 101 Ill. 2d 377, 390-91, 462 N.E.2d 478, 484-85.

In considering whether the defendant was denied a fair trial based on the jury's exposure to pretrial adverse publicity, the *Sanchez* court stated:

" 'Total ignorance of the case is exceptional, and it is not required.' ([*Taylor*, 101 Ill. 2d at 386, 462 N.E.2d at 482]; *Irvin v. Dowd* (1961), 366 U.S. 717, 722-23, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1642-43.) It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. [Citation.] In assessing a claim of partiality due to pretrial publicity, a reviewing court has an obligation to evaluate the *voir dire* testimony of the jurors [citations], and to review the entire record to determine independently whether the defendant received a fair trial." *Sanchez*, 115 Ill. 2d at 263, 503 N.E.2d at 285.

■ Here, although defendant submitted 57 notarized affidavits of Pike County citizens stating they believed he could not receive a fair and impartial jury, none of the affidavits specifically indicated why they thought prejudice existed against him in the entire Pike County area. A general familiarity with the case is not a sufficient basis for a change of venue. (*Friday*, 232 Ill. App. 3d at 1052, 598 N.E.2d at 305.) Moreover, as set forth by the State at the hearing on the mo-

tion, many of the affiants were family members of defendant, or someone who knew defendant personally. Defense counsel never denied the accuracy of that statement. There is no indication how many people were contacted in order to obtain the 57 affidavits, and in any event, 57 affidavits out of the entire Pike County population does not indicate that the adverse publicity was so pervasive that defendant could not have an impartial jury.

Defendant notes that the general population of Pike County is 18,896 people, and in Barry where the shootings took place the population is 1,487 people. Defendant claims that the allegedly extensive adverse publicity in such a small county from newspapers, television, radio and word of mouth made it impossible for him to receive a fair trial, even if the jurors stated under oath that they would disregard anything they may have read, or would be able to put aside any preconception regarding defendant's guilt. The record contains approximately 10 newspaper articles from the *Quincy Herald-Whig* and the *Jacksonville Journal Courier*. The first article was published the day after his arrest, and the remaining articles were published before and during defendant's first trial, ending on September 14, 1991, reporting that the judge ordered a mistrial because the jury was unable to reach a verdict. Defendant's second trial began approximately 1½ months after the last newspaper article. The record does not contain any proof of the content of coverage of this case by radio or television.

An examination of the newspaper articles does not show any biased reporting or editorials denouncing defendant or asking for his conviction. The articles reported defendant's arrest and charges, necessarily reporting the death of one of the victims, and head injuries sustained by the other victim. The articles also quoted certain witnesses' testimony, including the testimony of the complaining witness and the testimony of defendant claiming he could not remember what happened at the time of the shootings.

Defendant claims that 51 of the 53 potential jurors had heard of the case and all of the actual 12 jurors, and one alternate, knew about the case from television, newspapers, radio or word of mouth. Moreover, defendant maintains the relationships of the potential jurors and/or the actual jurors with the witnesses were so prevalent as to ensure that he could not receive a fair trial.

The *voir dire* transcript indicates that 53 jurors were examined before the 12 and 2 alternates were selected. Only 11 potential jurors were excused for cause because they could not set aside preconceived opinions of defendant's guilt. Defendant used all 14 peremptory chal-

lenges, but did not make any request for a juror to be excused for cause based on pretrial publicity. As defendant noted there were some potential jurors who knew witnesses; however, the majority of those potential jurors were not selected. Two actual jurors stated they were acquainted with certain witnesses, but had never been to those witnesses' homes and did not believe the acquaintanceship would cause them any difficulty in the case. In addition, one juror's daughter-in-law served as a juror in defendant's first trial; however, she stated she did not discuss the facts of the case with her daughter-in-law. Nevertheless, the transcript indicates that defendant exercised peremptory challenges on potential jurors who had little knowledge of the case and no relationship with any witnesses. Most all of the jurors knew of the case, but all stated they could set aside what they heard or read and decide the case based solely on the evidence at trial.

The instant case is distinguishable from *Taylor* (101 Ill. 2d at 399, 462 N.E.2d at 488), where the Illinois Supreme Court affirmed the appellate court's reversal of the trial court's order denying that defendant's pretrial motion for change of venue based on adverse publicity. The *Taylor* court noted that the media coverage in that case in Peoria was unprecedented. Newspaper, radio, and television stations covered the case reporting details from the day of the crime until the end of the trial. One newspaper article reported that the defendant failed a polygraph test, but that the codefendant passed. Another newspaper article mentioned the defendant's confession and polygraph results. In addition, the transcript of the *voir dire* indicated widespread awareness of the case. *Taylor*, 101 Ill. 2d at 391-92, 462 N.E.2d at 483-84.

As a result of the extensive pretrial publicity the *Taylor* court concluded that the jurors' bare assertions that they had not formed opinions or could set aside any opinions were insufficient. The *Taylor* court placed much significance on the newspaper articles reporting the results of the polygraph, which are inadmissible to prove either guilt or innocence, and the subtle prejudicial effect of this information on jurors. Here, the newspaper reporting of the case did not involve results of a polygraph test, or any type of information that would unfairly prejudice the defendant.

Moreover, here the trial court took steps to ensure defendant received a fair and impartial jury. The jurors were questioned in panels of four to prevent potential jurors from being influenced by the statements of other potential jurors. The court questioned the jurors extensively about their knowledge of the case and any relationship with witnesses. The court stressed that the juror would have to set any knowledge or opinions aside and render a verdict solely on the evi-

dence at trial. We conclude that based on all the evidence the court did not err in denying defendant's motion for change of venue.

In addition, defendant maintains the court erred by granting the State's supplemental motion *in limine*, thereby preventing him from introducing evidence that he suffered from PTSD at the time of the shootings. The record indicates that prior to trial the State filed a motion *in limine* seeking, among other things, to prevent defendant from introducing evidence of PTSD and his Vietnam experiences. The motion asserted that PTSD was a mental disorder and defendant had not raised the insanity defense. In addition, the motion maintained that PTSD and defendant's Vietnam experience were not relevant to defendant's anticipated defense of intoxication and that such evidence would only confuse the jury. The State subsequently filed a motion for psychiatric evaluation alleging that defendant claimed to suffer from PTSD and had not been diagnosed by a qualified psychiatrist.

At the hearing on the State's motion *in limine* and motion for psychiatric evaluation, defense counsel stated that he intended to introduce testimony from a clinical social worker that defendant suffered from PTSD. Defense counsel argued that the evidence of PTSD and defendant's Vietnam experience was not going to be used to prove defendant had a mental illness, but rather, to explain why defendant had an alcohol abuse problem, which was allegedly relevant to his defense of intoxication. The court granted the State's motion for a psychiatric evaluation, and took the motion *in limine* under advisement until the completion of the psychiatric examination.

Subsequently, the State filed a supplemental motion *in limine* seeking to preclude defendant from introducing evidence of PTSD or his Vietnam experience, alleging defendant failed to comply with the court-ordered psychiatric examination. Following a hearing, the court granted that State's supplemental motion, stating in part:

> "The Court is of the opinion that the Defendant cannot attempt to present evidence which may result in the jury being sympathetic or bias[ed] or prejudice[d] about his [PTSD], whether or not that exists or not and then refuse at the same time as a matter of trial strategy to not submit to the examination. *** [Defendant's expert] will not be allowed to testify on those issues. I realize his area of expertise is broad, and he may testify on the issue of alcoholism. In addition, the State has in past stated good reasons for excluding some evidence dealing with [PTSD], separate from the refusal of the examination."

The court did allow evidence that defendant was a soldier in Vietnam and, while there, drank a lot of alcohol. Defendant does not argue on appeal that the court erred in ordering a psychiatric examination.

Defendant contends the court's order precluding him from introducing evidence of PTSD was a denial of his sixth and fourteenth amendment right to present a defense and was in violation of section 115—6 of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1991, ch. 38, par. 115—6). We disagree for reasons we will discuss.

■■ Section 115—6 of the Code provides for the appointment of a psychiatrist or clinical psychologist if, among other defenses, the defendant raises the defense of intoxication or drugged condition. Here, defendant indisputably raised the defense of intoxication. Section 115—6 of the Code further provides as follows:

"Any statements made by defendant to such experts shall not be admissible against the defendant unless he raises the defense of *** drugged condition, in which case they shall be admissible only on the issue of whether he was *** drugged. The refusal of the defendant to cooperate in such examination[ ] shall not automatically preclude the raising of the aforesaid defenses but shall preclude the defendant from offering expert evidence or testimony tending to support such defenses if the expert evidence or testimony is based upon the expert's examination of the defendant. *If the Court, after a hearing, determines to its satisfaction that the defendant's refusal to cooperate was unreasonable it may, in its sound discretion, bar any or all evidence upon the defense asserted.*" (Emphasis added.) Ill. Rev. Stat. 1991, ch. 38, par. 115—6.

Defendant maintains that in accordance with section 115—6 of the Code the court should have taken less drastic measures and only ordered excluded that portion of the expert testimony which was directly learned from the expert's examination. Consequently, defendant maintains the court should have allowed his expert to testify in general about PTSD symptoms, causes and effects, and in particular how PTSD relates to alcoholism. Defendant notes the court was aware of the breadth of the testimony available to the defense because the court heard evidence on PTSD at the first trial. Defendant claims that pursuant to section 115—6 of the Code the court must make a finding that the defendant's refusal to cooperate with the court-ordered examination was unreasonable, and here the court failed to make such a specific finding.

■ Initially, we note that section 115—6 of the Code authorizes a psychiatric evaluation for a defendant who raises the defense of intoxication, and here defendant was not precluded from raising the defense of intoxication by failing to cooperate with the court-ordered psychiatric examination. Evidence of PTSD was only going to be offered to supply the jury with a reasonable explanation for his alcoholism, and such evidence was not necessary for the defense of intoxication, which requires evidence that the intoxication was "so extreme as to suspend the power of reason and render [defendant] incapable of forming a specific intent which is an element of the offense." Ill. Rev. Stat. 1991, ch. 38, par. 6—3(a).

■ Section 115—6 of the Code authorized the court to bar all evidence of PTSD if the defendant's refusal to cooperate with the court-ordered examination was unreasonable. That section does not require the court to make such a specific finding. Here, defendant's only explanations for failing to cooperate were his fear (1) of giving damaging evidence to the court-appointed psychiatrist, who was suggested by the State; and (2) the State's request was made so soon before anticipated trial that, if the examiner's report was prejudicial to defendant, he would not have ample time to find a second psychiatrist to examine him. Clearly, fear of an adverse finding is not a reasonable ground for refusing to submit to an examination. This possibility exists in every case where the prosecution invokes the provisions of section 115—6 of the Code. The order for examination was entered on October 9, 1991, and the trial was set for October 25, 1991. The prosecutor stated that the psychiatrist named in the order had been available at the time of the entry of the order and the defense did not dispute that assertion. Under these circumstances, the court did not abuse its discretion in treating defendant's refusal to submit to the examination as being unreasonable although no specific finding was made.

Defendant also claims that he was denied his sixth and fourteenth amendment right to a defense by not being allowed to offer evidence of PTSD. Defendant claims evidence of PTSD was relevant as it relates to chronic alcoholism and to specific bouts of intoxication and, therefore, should have been admitted. Defendant refers to *People v. Bradley* (1988), 172 Ill. App. 3d 545, 551, 526 N.E.2d 916, 921, where this court noted that not all relevant evidence is automatically admissible and "[t]here must be a balancing between the probative weight of the evidence and any unfairly prejudicial effect it might have. Only when the probative weight overcomes the possible prejudice should the evidence be allowed." Here, the court performed such a balancing

test and concluded that without a qualified psychiatrist's opinion regarding whether defendant actually had PTSD, the prejudicial effect of such evidence outweighed the probative value.

Defendant also refers to *People v. Minnis* (1983), 118 Ill. App. 3d 345, 455 N.E.2d 209, where this court reversed and remanded that defendant's conviction of murder because the trial court excluded as irrelevant evidence of "battered woman syndrome" offered to explain the defendant's conduct in dismembering her husband's body after she killed him, and further refused to permit defense counsel to make an offer of proof thereon. This court concluded that evidence of the syndrome was relevant and admissible to rebut the State's allegation that her conduct in dismembering the body was proof of her consciousness of guilt. This court examined the defendant's experts' reports on the syndrome and deemed that such evidence made a *prima facie* case of relevancy to the defense. This court stated that "[t]he defendant had a right to present evidence relevant to her explanation of her conduct, no matter how far-fetched it might appear to the average individual." (*Minnis*, 118 Ill. App. 3d at 357, 455 N.E.2d at 218.) The instant case, however, is distinguishable from *Minnis* because there, that defendant offered evidence from a clinical psychologist and a psychiatrist as to the battered woman syndrome. Moreover, she did not refuse to cooperate with a court-ordered psychiatric evaluation.

■ Accordingly, we conclude that because defendant failed to cooperate with the court-ordered psychiatric examination, the court did not abuse its discretion by excluding defendant's evidence of PTSD. Even if evidence of PTSD was relevant to the defense of intoxication, the prejudicial effect of such evidence, without a qualified diagnosis, outweighed the probative value.

Defendant also claims the court abused its discretion in sentencing by considering as a statutory aggravating factor that his conduct caused serious harm to the victims, when the causation of serious harm is implicit in the offenses of first degree murder and attempt (first degree murder). Section 5—5—3.2(a)(1) of the Unified Code of Corrections lists as an aggravating factor to be considered in imposing a more severe sentence the fact that the "defendant's conduct caused or threatened serious harm." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(a)(1).) Here, defendant was sentenced to 25 years' imprisonment for first degree murder, which offense had a possible range of sentencing of not less than 20 and not more than 60 years, and was sentenced to a concurrent term of 15 years' imprisonment for attempt (first degree murder), which offense had

a possible range of sentencing of not less than 6 years and not more than 30 years. Ill. Rev. Stat. 1991, ch. 38, pars. 8—4(c)(1), 1005—8—1(a)(1), (a)(3).

At the sentencing hearing the court noted the mitigating factors and then stated: "[i]n terms of factors in aggravation there is no question that your conduct caused the most serious harm that can be caused. The death of an individual who had a right to live[,] [a]nd the serious injury to another individual[.]" Consideration of a factor necessarily implicit in the offense cannot be used as an aggravating factor for sentencing. (*People v. Conover* (1981), 84 Ill. 2d 400, 419 N.E.2d 906.) Here, the causation of serious harm is certainly implicit in the offenses of first degree murder and attempt (first degree murder).

■ Initially, the State claims that defendant waived this contention of error by failing to object when the trial court made the alleged finding that causation of serious harm was an aggravating factor. We agree. This court has previously deemed defense counsel's failure to object at sentencing to the court's use of causation of serious harm as an aggravating factor when serious harm is implicit in the offense as a waiver of that issue for purposes of appeal. *People v. Montague* (1986), 149 Ill. App. 3d 332, 500 N.E.2d 592; *People v. Killings* (1986), 150 Ill. App. 3d 900, 501 N.E.2d 1363.

In any event, inasmuch as the trial court improperly considered the causation of serious harm as an aggravating factor, the court's comments as a whole indicate that the court noted that factor in passing and placed upon it little weight in determining the length of sentencing. Consequently, remandment would not be required. (*People v. Bourke* (1983), 96 Ill. 2d 327, 449 N.E.2d 1338.) The record indicates that the court's emphasis was deterrence and the need to alert substance abusers to correct their problems before they commit a very serious crime. The court also emphasized the need to protect society, and the impact, here, of the offenses on the families of victims. Accordingly, we conclude the court did not abuse its discretion in making a cursory comment on the causation of serious harm.

Finally, defendant claims the court erred in ordering that he pay restitution within 12 months of his release from the Department of Corrections. Defendant claims this portion of his sentence should be vacated without remanding for modification. The State concedes that the court's order for restitution violated section 5—5—6(f) of the Code, which requires the court to "fix a period of time not in excess of 5 years within which payment of restitution is to be paid in full." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—6(f).) The State, however,

maintains that the proper remedy should be to remand to the circuit court to fix the method and time of payment according to section 5—5—6(f) of the Code.

Defendant relies on *People v. Fisher* (1989), 186 Ill. App. 3d 255, 266, 542 N.E.2d 1127, 1134, where this court reversed the portion of the circuit court's order that defendant pay restitution within two years after his release from prison. That defendant argued the court failed to take into consideration his ability to pay restitution as required by section 5—5—6(f) of the Code. This court reversed the order of restitution without remanding for modification, noting that the order for restitution did not comply with the time limit of section 5—5—6(f) of the Code. The State maintains this court should follow the recent decision in *People v. Speirs* (1992), 231 Ill. App. 3d 807, 812-13, 596 N.E.2d 1257, 1261, where this court concluded that rather than reversing an improper restitution order without remanding for modification, the better practice is to vacate the improper order and remand for entry of a proper order.

■ Nevertheless, in the instant case defendant was sentenced to a lengthy term of imprisonment and claims he will not be able to pay restitution within five years because, as a prison inmate, he is indigent. There was no evidence at sentencing that defendant would be able to pay a restitution in the total amount of $3,848.43 while in prison. Accordingly, we reverse the circuit court's restitution order without remanding for modification.

For the foregoing reasons, we affirm the conviction and sentence and reverse only the court's order of restitution.

Affirmed in part; reversed in part.

McCULLOUGH and COOK, JJ., concur.