NOTICE

Decision filed 04/28/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 170300-U

NO. 5-17-0300

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 00-CF-200 |
| | ) | |
| CHRISTOPHER L. ALEXANDER, | ) | Honorable |
| | ) | Jeffrey A. Goffinet, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Barberis and Wharton concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court's dismissal of the defendant's *pro se* amended postconviction petition at the second stage of the postconviction proceedings is affirmed where he failed to make a substantial showing that his appellate counsel was ineffective.

¶ 2   At a jury trial in the circuit court of Williamson County, the defendant, Christopher Alexander, was found guilty of first degree felony murder for participating in the underlying offense of armed robbery that led to the death of Maxine McKenzie, a 78-year-old widow. McKenzie was brutally murdered and sexually assaulted on June 24 or 25, 2000, after being robbed in her own home. The defendant was sentenced to 60 years' imprisonment. This court affirmed the conviction and sentence. *People v. Alexander*, No.

1

5-04-0322 (2006) (unpublished order under Illinois Supreme Court Rule 23). Subsequently, the defendant filed an amended *pro se* petition for postconviction relief pursuant to section 122-1 of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 (West 2016)), which was dismissed by the trial court at the second stage of the postconviction proceedings. On appeal, the defendant argues that the court erred in dismissing his postconviction petition in that it made a substantial showing of a constitutional violation, *i.e.*, that his appellate counsel was ineffective. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On June 25, 2000, the defendant arranged a meeting with Orien Drew, the chief of police of Carterville, Illinois, to speak with Drew about events he witnessed the night before. During their discussion, the defendant told Drew that he had witnessed a murder the previous night. Drew then suggested that they speak at the police station, to which the defendant agreed. The defendant was not in custody at this time, and he voluntarily rode to the police station with Drew. When they arrived at the station, the defendant was given *Miranda* warnings, and he signed a waiver of his rights. Drew and Eric Frattini, a detective with the Williamson County Sheriff's Department, began to interview the defendant at 5:08 p.m. The defendant stated that he witnessed a murder in Hurst and that he knew where to find the murder weapon, a gun. The defendant then directed the officers to a creek where he indicated that the murder weapon had been discarded. He indicated that he took the gun and threw it into the creek. A gun was subsequently found at this location.

2

¶ 5     After returning to the police station at approximately 8:30 p.m., the defendant consented to a taped statement and was given his *Miranda* rights again.  At around 9 p.m., during the course of the interview, Frattini noticed that the tape recorder was not working properly, and they had to stop the interview to get a new recorder.  A new recorder and new tape were retrieved, and the defendant was given his *Miranda* rights before the interview resumed.  This interview ended at 9:30 p.m.

¶ 6     During the initial taped interview, the defendant told Drew and Frattini that at approximately 4:30 p.m. on June 24, 2000, he was at home when Larry Reid walked by. They talked, and the defendant agreed to buy some alcohol with Reid's $50, since Reid was underage.  On the way to the store, they were joined by David Hernandez and Lucas Duvall.  When they arrived at the store, the defendant and Hernandez went inside while Reid and Duvall stayed outside.  They bought four 12-packs of beer and walked back to the defendant's home, where they drank beer and played cards.  Shortly after 8 p.m., the four men decided to go to Hernandez's residence.  Along the way, they saw a police car and hid in a corn field, but they eventually made it to Hernandez's garage.  While there, they drank beer and "huffed" some paint.  Reid had cannabis, but an argument ensued over it, and Reid left for the evening, taking his cannabis with him.

¶ 7     At some point, Hernandez went into the residence and obtained a .22-caliber revolver.  He said he wanted to rob someone.  All three men handled the revolver, and Hernandez told the defendant he could shoot it, so the defendant fired a shot toward the back of the garage.

¶ 8   The three men left the garage and walked to a nearby Mini Mart.  Hernandez carried the revolver in his waistband.  When they arrived at the closed convenience store, someone kicked in the glass door.  The defendant and Hernandez went in and stole a case of beer.  The alarm sounded, and they saw a police car, so the three split up and went different directions.  The defendant made his way back to Hernandez's garage.

¶ 9   The defendant noted that Hernandez and Duvall were not in the garage when he returned to Hernandez's house.  When he exited the garage, he could see Hernandez and Duvall knocking on the door of the McKenzie residence, which was next door to the Hernandez residence.  The defendant saw a woman come to the door, and Hernandez pointed a gun at her.  Hernandez and Duvall then entered the McKenzie residence.  They were inside for 20 minutes, while the defendant stayed where he was until he moved over to look in the back door of the McKenzie's house.  After Hernandez, Duvall, and McKenzie exited the house, Hernandez shot McKenzie while she stood on her steps.  McKenzie begged them not to kill her.  Duvall then took the weapon and shot her, at which time she fell onto the steps.  Next, either Duvall or Hernandez told the other that they needed to "finish her off" so there would not be a witness.  Hernandez raped her on the steps, and then Duvall did the same.  Then, two or three more shots were fired into her head at point-blank range.  They then dropped the gun, stole the victim's car, drove down the street, and turned into a yard, where the vehicle became stuck.  Hernandez and Duvall exited the car and ran away.

¶ 10   The defendant then picked up the gun that had been dropped near the body and entered the McKenzie residence to see if anyone else was dead.  He saw that the victim's

4

dog had been killed. He saw a purse, with its contents strewn about the bedroom, and a broken window in the kitchen entry door. The defendant left the house without trying to help McKenzie. He did not call an ambulance or the police.

¶ 11 Sometime during the early morning hours of June 25, 2000, as the defendant's girlfriend was driving him toward Carterville, the defendant had her stop, and while urinating, he tossed the gun into a creek crossing under the country road. He said that he disposed of the gun because, earlier that night, he had touched it and fired it, and he did not know if his fingerprints were still on it; he was afraid that Hernandez and Duvall would say that he committed the murder. He then had his girlfriend take him to his great-aunt's house where he slept for approximately one hour. He left his great-aunt's house at approximately 10 a.m. He then went to his friend's house and told his friend that he had just witnessed a murder and asked advice on what to do. He eventually decided to speak with a Williamson County investigator about what he saw; he met with Drew shortly before 5 p.m.

¶ 12 After this initial statement, Drew spoke with Hernandez and Duvall. Upon learning that the defendant may have been more involved than he previously indicated, Drew returned to the defendant to discuss what Hernandez and Duvall had said; it was approximately 3 to 3½ hours before the officers returned to talk with the defendant again. They talked to the defendant for about 1½ hours, and he agreed to make a recorded statement. In his second statement, which began at 2:44 a.m., the defendant said that everything he previously stated was accurate up to the point where he returned to Hernandez's house after leaving the Mini Mart. Instead of being separated, the three

5

returned together. The defendant then admitted he had been a "watch out" while the other two were in the house and that he was the one who had driven the victim's car in an attempt to get away. After the car got stuck, they attempted to push it out, but were unsuccessful, so they left it there and split up. He admitted accepting about $40 from the residence. The defendant further admitted that he agreed to dispose of the gun after the car got stuck. In this second statement, the defendant made no mention of entering the victim's home. The defendant was then arrested.

¶ 13    Duvall and Hernandez pled guilty to first degree felony murder, intentional murder, and felony murder based on aggravated criminal sexual assault. At the defendant's jury trial, the State's theory of the case was that Hernandez and Duvall were the principals and that the defendant was accountable for their actions. In his defense, the defendant claimed that he witnessed the offenses but did not knowingly or willingly participate. Both of the defendant's statements were replayed for the jury in their entirety. John Rother, a crime scene investigator with the Illinois State Police (ISP), testified that a .22-caliber revolver was recovered from the creek that the defendant identified as the location where he disposed of the murder weapon. John Nagle, a former crime scene investigator with the ISP, testified that he processed the outside of the victim's vehicle and lifted latent prints on the passenger side of the vehicle's hood and front fender. Michael Cooper, a forensic scientist with the ISP Southern Illinois Forensic Science Center, testified that he could not say that the bullet fragments that were recovered from the victim's body were fired from the gun recovered from the creek; he also testified that he could not eliminate the gun as the source of the fragments. Bruce Warren, a latent fingerprint examination specialist with

6

the ISP, testified that two out of the three latent prints discovered on the exterior of the victim's vehicle matched the defendant's palm print. After hearing the evidence, the jury found the defendant guilty of first degree felony murder. The trial court sentenced him to 60 years' imprisonment.

¶ 14    On direct appeal, the defendant made the following four arguments: (1) he was not proven guilty beyond a reasonable doubt; (2) he was denied a fair trial because the State presented highly prejudicial other-crimes evidence, the court admitted into evidence a weapon that was not tied to the offense, and the State made an improper closing argument; (3) his sentence of 60 years' imprisonment was excessive; and (4) the compulsory extraction of his blood and the storing of his DNA profile violated his fourth amendment right to be free from an unreasonable search and seizure. This court affirmed his conviction and sentence. *People v. Alexander*, No. 5-04-0322 (2006) (unpublished order under Illinois Supreme Court Rule 23).

¶ 15    On June 13, 2007, the defendant filed a *pro se* petition for postconviction relief, claiming, *inter alia*, that his right against self-incrimination was violated where his statements were obtained without a knowing and voluntary waiver of his *Miranda* rights. On July 21, 2016, the defendant's appointed counsel filed an amended postconviction petition, asserting that the defendant's right against self-incrimination was violated where his confession was taken without a valid waiver of his *Miranda* rights and his confession was the product of coercion and undue influence, and he was denied his right to a fair trial by an impartial jury due to pretrial publicity after his motion for change of place of trial was denied. The petition also alleged that the defendant was denied effective assistance of

appellate counsel where counsel failed to raise these issues on direct appeal. Counsel filed a certificate in compliance with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013).

¶ 16 On October 31, 2016, the trial court granted the defendant's counsel leave to withdraw pursuant to the defendant's request. The defendant was allowed to proceed *pro se*. On February 10, 2017, the defendant filed a *pro se* amended petition for postconviction relief, contending, *inter alia*, that he was denied due process when his confession was taken without a valid waiver of his *Miranda* rights, and he was denied his right against self-incrimination and right to remain silent when his confession was the product of coercion and undue influence. Specifically, he argued that he suffered from impaired brain function, had a low IQ, had an extensive history of mental illness, and was sleep deprived and under the influence of intoxicating substances at the time that he made the incriminating statements, which made it impossible for him to knowingly and voluntarily waive his *Miranda* rights. In support of this argument, he points to testimony from Dr. Michael Gelbort,[1] a clinical neuropsychologist, who had examined him and opined on his ability to understand the rights and meaning of the *Miranda* warnings. The defendant argued that he was denied effective assistance of appellate counsel because his counsel did not raise these issues on direct appeal. He also asserted that he was denied effective assistance of appellate counsel because his counsel did not argue that the trial court erred in denying his motion for change of place of trial due to pretrial publicity.[2]

---

[1]Dr. Gelbort testified at the hearing on the defendant's motion to suppress his incriminating statements as well as at the defendant's trial. We will go into the necessary detail about Dr. Gelbort's testimony later in this decision.
[2]We will discuss the motion for change of place of trial in further detail below.

8

¶ 17    On May 19, 2017, the State filed a motion to dismiss the defendant's *pro se* amended postconviction petition.  In the motion, the State argued that the amended petition failed to make a substantial showing of a constitutional violation where there was more than sufficient evidence to show a knowing and voluntary waiver of the defendant's *Miranda* rights.  The State also contended that the defendant's claims that his trial was unfair and that he did not have an impartial jury were not supported by the record where each selected juror said that they could set aside anything they may have read or heard about the case, had not already formed an opinion on the case, and could be fair and impartial.  The State also asserted that these issues were forfeited because they could have been raised on direct appeal.  As for the ineffective assistance of counsel claims, the State argued that the defendant could not show that he suffered any prejudice from the alleged errors and that none of his appellate counsel's actions fell below an objective standard of reasonableness.

¶ 18    On July 3, 2017, the defendant filed a *pro se* objection to the State's motion to dismiss.  In the objection, the defendant contended that he made a substantial showing that he received ineffective assistance of appellate counsel.

¶ 19    On July 13, 2017, the trial court entered a written order, dismissing the defendant's *pro se* amended postconviction petition.  In the order, the court found, *inter alia*, that the defendant failed to make a substantial showing that his waiver of his *Miranda* rights was not knowing and voluntary in that the *Miranda* warnings were administered to him on four occasions, and on each occasion, the record evidenced his consent.  The court also found that the defendant failed to make a substantial showing that he did not receive a trial by an

9

impartial jury as a result of pretrial publicity where the pretrial reports did not involve matters that were inadmissible, the court and counsel questioned each potential juror individually so as to not contaminate the jury pool with misinformation, and the chosen jurors each indicated an ability to decide the matter solely on the evidence presented at trial. The court acknowledged that the potential jurors had been exposed to "some degree of pretrial publicity," but each chosen juror expressed the ability to be fair and impartial. The defendant appeals.

¶ 20                                    II. ANALYSIS

¶ 21                             A. Standard of Review

¶ 22    The Act (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a mechanism for criminal defendants to challenge their convictions or sentences based on a substantial violation of their rights under the federal or state constitutions. *People v. Morris*, 236 Ill. 2d 345, 354 (2010). A proceeding under the Act is a collateral attack on the trial court proceedings and not an appeal from defendant's conviction and sentence. *People v. English*, 2013 IL 112890, ¶ 21. To be entitled to postconviction relief, defendant must show that he suffered a substantial deprivation of his federal or state constitutional rights. *Id*. The Act establishes a three-stage process for adjudicating a postconviction petition. *Morris*, 236 Ill. 2d at 354. At the first stage, the trial court must review the postconviction petition and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2016). If the petition is not dismissed at the first stage, it advances to the second stage. *Id*. § 122-2.1(b).

¶ 23　　At the second stage, the trial court may appoint counsel who may amend the petition to ensure defendant's contentions are adequately presented. *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006). Also, at the second stage, the State may file an answer or move to dismiss the petition. 725 ILCS 5/122-5 (West 2016). If the State files a motion to dismiss, the court must rule on the legal sufficiency of defendant's allegations, taking all well-pleaded facts as true. *People v. Johnson*, 205 Ill. 2d 381, 389 (2002). A petition may be dismissed at the second stage only when the allegations in the petition, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation. *People v. Hall*, 217 Ill. 2d 324, 334 (2005). If a substantial showing of a constitutional violation is established, the postconviction petition proceeds to the third stage for an evidentiary hearing where the credibility of the witnesses can be assessed, and factual disputes raised by the pleadings can be resolved. *People v. Coleman*, 183 Ill. 2d 366, 380-82 (1998). In this case, the State filed a motion to dismiss, and the trial court granted the motion. The dismissal of a petition without an evidentiary hearing is subject to *de novo* review. *Hall*, 217 Ill. 2d at 334.

¶ 24　　　　　　　　B. Ineffective Assistance of Appellate Counsel

¶ 25　　Ineffective assistance of appellate counsel is determined under the same standard as a claim of ineffective assistance of trial counsel. *People v. Golden*, 229 Ill. 2d 277, 283 (2008). To determine whether a defendant was denied his right to effective assistance of counsel, a court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted in Illinois by *People v. Albanese*, 104 Ill. 2d 504 (1984). *Golden*, 229 Ill. 2d at 283. Under *Strickland*, a defendant must prove both (1) appellate

11

counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance resulted in prejudice. *People v. King*, 316 Ill. App. 3d 901, 913 (2000). A defendant is prejudiced by counsel's deficient performance if there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's deficiency. *People v. Colon*, 225 Ill. 2d 125, 135 (2007). To prevail, defendant must satisfy both prongs of the *Strickland* test. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). The failure to satisfy either the deficiency prong or the prejudice prong precludes an ineffective assistance of counsel finding. *People v. Enis*, 194 Ill. 2d 361, 377 (2000).

¶ 26 Appellate counsel is not required to raise every conceivable issue on appeal (*People v. Collins*, 153 Ill. 2d 130, 140 (1992)), and counsel's decisions regarding what issues to raise on appeal are normally entitled to substantial deference (*People v. Mack*, 167 Ill. 2d 525, 532 (1995)). Appellate counsel will be deemed ineffective for failing to raise a meritorious issue that could have resulted in relief for defendant. *People v. Moore*, 177 Ill. 2d 421, 428 (1997). Counsel's decision as to what issues to raise on appeal will not be questioned unless the decision was patently erroneous. *People v. Richardson*, 189 Ill. 2d 401, 412 (2000).

¶ 27                        C. Motion to Suppress

¶ 28 The defendant's first contention is that his *pro se* postconviction petition made a substantial showing that his appellate counsel was ineffective for failing to argue that his waiver of his *Miranda* rights was not knowing and voluntary due to being sleep deprived,

12

being under the influence of intoxicating substances, and his emotional and/or mental problems or illnesses. We disagree.

¶ 29   On November 30, 2001, the defendant filed a motion to suppress the statements that he made to Drew and Frattini about his involvement in the murder. In the motion, the defendant acknowledged that his *Miranda* rights were read to him but contended that, at the times that he waived those rights, he was under the influence of intoxicating substances, was sleep deprived, and was suffering from severe emotional and/or mental health issues. He contended that, as a result of those issues, he was unable to fully understand his rights and did not make a knowing and voluntary waiver of his rights.

¶ 30   At the December 5, 2002, hearing on the motion to suppress, the following testimony was presented about the circumstances surrounding the questioning of the defendant, which led to his incriminating statements concerning his involvement in this matter. Drew testified that the defendant arranged a meeting with him to discuss the events that occurred the night before. The defendant voluntarily agreed to go with Drew to the police station, he was not in custody, and his *Miranda* rights were initially read to him at 5:08 p.m. He appeared to understand his rights and signed the written waiver form. Though the defendant was Mirandized several times, this was the only time that he was given a written waiver form that night. He voluntarily agreed to give the recorded statements about what happened. After the tape recording malfunctioned during the initial questioning, the officers stopped the questioning. Before the questioning resumed, the defendant was again read his *Miranda* warnings, and he verbally indicated that he understood. The second interview began at 9 p.m. and ended at about 9:30 p.m. During

these two interviews, the defendant did not implicate himself as a participant in this incident; he claimed he was just a witness. It was not until the third interview, which began at 2:44 a.m. and ended at 2:56 a.m., that the defendant said he was a lookout. The defendant was in a locked room with another officer for approximately 4½ to 5 hours between the second and third interview. The defendant was also read his *Miranda* rights before the third interview, and he again verbally indicated that he understood. He was given food and drink and was allowed to smoke in between the interviews.

¶ 31    During this entire time, the defendant never said that he was under the influence of any alcohol or drugs, he did not appear to be under the influence of any intoxicating substances, and he appeared "physically fine." Drew observed that the defendant was walking fine, was not slurring his speech, did not appear confused, and was coherent. The defendant appeared to understand the questions that were asked of him, and he never requested that the questioning stop. He never requested an attorney and never requested to leave. Drew testified that none of the officers threatened or made any promises to the defendant to get him to make the statements.

¶ 32    Drew testified that he had previous encounters with the defendant that started when the defendant was approximately 12 or 13 years old. He had given the defendant his *Miranda* rights on more than one occasion. The defendant had never indicated that he did not understand his rights during those encounters. He acknowledged that if the *Miranda* warnings were written at a higher level than the defendant could read, then the defendant likely would have trouble understanding them. However, he noted that the defendant did not have any problem reading the *Miranda* warnings to him. He also acknowledged that

14

the defendant indicated that he only had approximately two to three hours of sleep the night before. He further acknowledged that the defendant admitted drinking, smoking marijuana, and huffing spray paint during the night of the incident, but he never gave the defendant a test to determine if he was under the influence. He further acknowledged that he never asked the defendant if he had consumed any intoxicating substances on the day of the interviews. However, Drew stated that during the defendant's detailed report of what happened the night of the murder and the following day, he did not indicate that he had consumed any intoxicating substance before he met with Drew.

¶ 33 Frattini testified that he was present when the defendant was given his *Miranda* warnings and that the defendant was given those warnings before each taped statement was taken. The defendant indicated that he understood each of those rights, read most of them aloud the first time that they were given, and signed the written waiver form. After receiving the warnings, the defendant agreed to speak with him and Drew. During the entire time that the defendant was with the officers, Frattini never threatened him or made any promises to him. He also never observed any of the other officers threatening the defendant. The defendant did not appear to be under the influence of alcohol, drugs, or any other substance. He was coherent, did not have difficulty speaking with them, and was walking fine.

¶ 34 Dr. Gelbort testified that he was a clinical neuropsychologist and, as a part of his practice, he conducted neuropsychological evaluations on people charged with crimes, which assessed the person's brain function. Dr. Gelbort conducted a neuropsychological evaluation on the defendant in May 2002, which included giving the defendant a variety of

tests, including an IQ test; reviewing the taped statements and police reports; and getting a background health history from the defendant. He did not review any of the defendant's medical or school records. The defendant reported that he had difficulty in school, did not complete the tenth grade, and obtained his general educational diploma (GED) when he was 17.

¶ 35    Dr. Gelbort reported that the defendant had an IQ of 88, which was considered the low average range approaching the average range. He was in the impaired range on the brain's frontal lobe abilities, he had some difficulty with reasoning, and he likely had some congenital weakness in terms of higher cognitive abilities. Dr. Gelbort noted that the defendant had self-reported a history of huffing paint, which could suppress his thinking and decision-making skills. Dr. Gelbort stated that being under the influence of alcohol or drugs would cause a normal brain to act like an impaired brain and that lack of sleep would exacerbate any impairment. The defendant also reported that he had been knocked unconscious at least twice and that could have residual effects on a person. Dr. Gelbort testified that cognitive disfunction was not apparent from observing someone.

¶ 36    Dr. Gelbort testified that the *Miranda* warnings were written at between a sixth-grade and eighth-grade level and that the defendant's reading was at a fifth-grade level. Dr. Gelbort opined that the defendant would have significant difficulty with a reasonable level of comprehension of the *Miranda* warnings. He believed that the defendant's understanding of the warnings would likely be marginal but adequate if he was well rested and sober. However, if he was tired and still under the effects of alcohol and inhalants, then his comprehension would be poor, and his ability to anticipate the consequences of

16

his own actions or make decisions regarding waiving his rights would be impaired. Dr. Gelbort found that the defendant likely had some understanding of the warnings but that understanding was not normal or appropriate.

¶ 37    The State offered no expert to rebut Dr. Gelbort's expert opinion. After hearing the arguments of counsel, the trial court took the matter under advisement. On December 7, 2002, the court entered an order by docket entry, which denied the defendant's motion to suppress. In the order, the court found that the defendant was given *Miranda* warnings on at least four occasions on the date of questioning, the warnings were given prior to any questioning by police authorities, the questioning commenced after the defendant asked to speak with Drew, the defendant was not initially in custody or under arrest, the defendant made no claim that any statement was procured through force or coercion, he clearly waived his *Miranda* rights every time that they were given to him, his statements were voluntarily given, and he did not claim that he was under the influence of drugs or alcohol at the time that he gave his statements. Also, the court, noting that it had listened to the tape recordings, observed that the defendant appeared to understand the various questions that the officers asked him and that he was coherent and responsive. The court noted that the defendant did not appear confused during the interviews, his IQ scores and other test results placed him in the low average range, he was not "mentally retarded," and it was not reported that he was in any special education classes in school. The court concluded that although the defendant reportedly had some deficiency in the functioning of the frontal lobe of his brain, which might cause him to be more susceptible to suggestions, when all

17

the factors involved were considered, the defendant gave a voluntary statement following a knowing, voluntary, and intelligent waiver of his rights.

¶ 38    A defendant's waiver of a constitutional right is only valid if it is clearly established that there was an intentional relinquishment or abandonment of a known right. *People v. Johnson*, 75 Ill. 2d 180, 187 (1979). A valid waiver of *Miranda* rights occurs where: (1) defendant's decision to relinquish those rights was voluntary and not the product of intimidation, coercion, or deception; and (2) defendant knowingly and intelligently waived his rights, *i.e.*, he made the waiver while fully aware of the nature of the rights being abandoned and the consequences of his decision to abandon them. *People v. Crotty*, 394 Ill. App. 3d 651, 662 (2009). To waive rights intelligently and knowingly, a defendant must at least understand basically what those rights encompass and minimally what the waiver will entail. *In re W.C.*, 167 Ill. 2d 307, 328 (1995). Intelligent knowledge in the *Miranda* context means defendant's ability to understand the very words used in the warnings. *Id*. at 334. If a defendant lacks the ability to understand the words used in the warnings, then the repetition of advice even accompanied by a defendant's statement of agreement indicates little. *Id*.

¶ 39    The issue of whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of each case, including defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of the questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by the police. *In re G.O.*, 191 Ill. 2d 37, 54 (2000). The test to be used in determining whether a defendant knowingly and intelligently waived his

18

rights is whether the words in the context used, considering the age, background, and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights. *People v. Daniels*, 391 Ill. App. 3d 750, 781 (2009).

¶ 40 Here, we find that the defendant failed to make a substantial showing of a constitutional violation for his appellate counsel's failure to argue that his waiver of his *Miranda* rights was not knowing and voluntary. The record reveals that the defendant initiated contact with Drew, willingly went with Drew to the police station, and was not under arrest at that time. He voluntarily gave three statements about what occurred that night, was read his *Miranda* rights four times, and signed a waiver of his *Miranda* rights after indicating that he understood each one. There was no indication that he did not understand his rights that night. Frattini corroborated Drew's testimony that the defendant did not appear to have any problems reading or understanding his rights. The officers' testimony indicated that the defendant was coherent, alert, and appeared to understand the questions that he was asked. Drew further testified that he had previous contact with the defendant where he read the defendant his *Miranda* rights, and the defendant never indicated that he did not understand his rights. He never requested that the questioning cease, and he never asked to leave. Also, the defendant agreed to take the officers to the location where he disposed of the gun. In between the interviews, the defendant was given food and drink and was allowed to smoke.

¶ 41 Although Dr. Gelbort testified that the defendant suffered from mild brain impairment, his ability to make reasoned decisions was suppressed, and he read at a fifth-grade level, the defendant's IQ was at the upper end of the low average range (just below

19

the average range), he completed his GED at the age of 17, there was no indication that the defendant was in any special education classes in school, and he was able to read the *Miranda* rights from the written waiver form. He was able to clearly answer the officers' questions and was responsive during the interviews. Dr. Gelbort did not review the defendant's medical or educational records. Further, during the time that the defendant was with the officers, he did not consume any intoxicating substances and did not appear under the influence. The defendant also did not indicate that he had consumed any intoxicating substances on the day that he sought out Drew.

¶ 42    The trial court had an opportunity to observe the officers' testimony as well as Dr. Gelbort, assessed their respective credibility, and determined that the defendant knowingly and voluntarily waived his *Miranda* rights. Evidence of a limited intellect alone is not enough to demonstrate that one is incapable of waiving his constitutional rights. *People v. Richardson*, 2015 IL App (1st) 113075, ¶ 18. Other facts to consider include defendant's age, prior experience with the law, and emotional stability. *Id.*

¶ 43    The court carefully considered the issue and clearly set forth its reasons for denying the motion to suppress. Accordingly, under the totality of the circumstances, considering the defendant's age, background, and intelligence, we cannot say that appellate counsel's performance was deficient for failing to raise this issue on appeal. Because the underlying issue has no merit, the defendant has not suffered any prejudice by his appellate counsel's failure to raise this issue on direct appeal. See *Enis*, 194 Ill. 2d at 382; see also *People v. Coleman*, 168 Ill. 2d 509, 523 (1995) (unless the underlying issues are meritorious,

20

defendant suffered no prejudice due to appellate counsel's failure to raise those issues on direct appeal).

¶ 44                                    D. Pretrial Publicity

¶ 45    The defendant next contends that he made a substantial showing that his appellate counsel was ineffective for failing to argue that the trial court abused its discretion when it denied his motion to change the place of trial due to extensive media coverage.   We disagree.

¶ 46    On September 26, 2003, the defendant filed a motion for change of place of trial based on the pretrial publicity that the case had received.   In the motion, the defendant contended that since the date of the incident, there had been extensive media coverage of the case in the Williamson County area, which was prejudicial to the defendant in that he would not receive a fair trial in Williamson County.

¶ 47    At the October 31, 2003, hearing on the motion for change of place of trial, Richard Hall, a Southern Illinois University communications professor, testified that on October 14, 2003, between 7 p.m. and 9 p.m., he conducted a telephone survey poll of 11,366 Williamson County households regarding McKenzie's murder.  The purpose of the survey was to reach as many potential jurors as possible to determine their familiarity with the case.  Of the 1468 individuals who answered the survey, 55% said they knew something about the case, while 45% did not know about it.  Regarding those who indicated that they were familiar with the case, 39% were not very familiar, 42% knew details, and 19% were very familiar.  As to their opinion on the defendant's guilt, 57% believed that he was guilty, 1% thought that he was probably innocent, and 42% had no opinion at that time.  The

21

defendant's counsel then submitted a compilation of transcripts of stories involving McKenzie's murder from local media outlets and noted that the murder had been mentioned 145 times in the media. The court then announced that it was taking the matter under advisement.

¶ 48　On December 1, 2003, before the trial court ruled on the motion for change of place of trial, the defendant filed a motion to renew that motion. In the motion, the defendant noted that on November 7, 2003, codefendant Hernandez pled guilty to the murder of McKenzie; the Williamson County State's Attorney contacted the media about the guilty plea; WSIL-TV news ran stories on the Hernandez guilty plea on its 5 p.m., 6 p.m., and 10 p.m. news broadcasts; the broadcasts showed a photograph of the decedent and included an interview with the state's attorney where he stated, "Two down, one to go"; and the report concluded by stating the date of the defendant's trial. The defendant contended that the State's actions in contributing to the pretrial publicity while the motion for change of place of trial was pending were improper and had removed "whatever chance for a fair trial and impartial jury remained" for the defendant in Williamson County.

¶ 49　On December 2, 2003, before commencement of *voir dire* for the jury trial, the trial court heard arguments on the defendant's motions for change of place of trial. After hearing arguments of counsel, the trial court denied the motion but noted that it could be renewed during *voir dire* if it became evident that it was necessary.

¶ 50　During *voir dire*, the prospective jurors were individually questioned outside of the presence of any other jurors and witnesses to determine whether there existed any prejudice against the defendant. Out of the 14 jurors that were chosen (including 2 alternates), 10

22

jurors had either heard or read news reports about the case. However, they all stated that they had not formed any opinions on the case, they could set aside what they had heard or read about the case, and they could reach a decision on the case based on the evidence and not what they heard or read.

¶ 51 Both the United States and the Illinois Constitutions protect a defendant's right to a trial before an impartial jury. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. For a jury's verdict to be impartial and fair, it must be solely based on the evidence heard during trial and not on information obtained elsewhere. *People v. Taylor*, 101 Ill. 2d 377, 386 (1984). If a defendant is denied his right to a fair trial because of the denial of a motion for change of venue or because of the denial of a challenge for cause to a juror, defendant must receive a new trial. *Id*. at 387. When determining whether a defendant received a fair trial from an impartial jury, "there is no simple test which we can apply to every case." *Id*. at 391. Rather, the decision must be based on the totality of the circumstances. *Id*.

¶ 52 The right to an impartial jury does not require that jurors be completely ignorant of the case before trial. *Coleman*, 168 Ill. 2d at 547. Heinous crimes are reported extensively in the media, and it would be unreasonable to expect jurors not to have at least heard of those cases prior to trial. *Taylor*, 101 Ill. 2d at 386. An impartial jury can be secured under such circumstances if the jurors are willing and able to put aside their preconceptions and decide the case based upon the evidence presented at trial. *Coleman*, 168 Ill. 2d at 547. Ordinarily, the best way to determine whether a juror can be impartial is to ask. *Taylor*, 101 Ill. 2d at 398. *Voir dire* is a significant tool in determining whether a juror can lay

23

aside any biases and make a determination solely on the basis of evidence presented in court. *Id.*

¶ 53 However, in some circumstances, the pretrial publicity is so prejudicial that jurors cannot be trusted to set aside their preconceptions and decide the case on the evidence presented. See, *e.g.*, *id.* In *Taylor*, the 13-year-old defendant was charged with murder in a highly publicized case. *Id.* at 382-83. The "unprecedented" media coverage reported that defendant's suspected codefendant had been released after passing a polygraph test, while the results of defendant's polygraph test were "inconclusive." *Id.* at 383. The *voir dire* questioning revealed that six of the jurors who ultimately found defendant guilty were aware that the codefendant had been released, and three connected his release to his performance on the polygraph test. *Id.* at 388. Our supreme court found that defendant was denied a fair trial because of the prejudicial effect of the knowledge of the lie detector test. *Id.* at 395-96. Based on the unprecedented volume of publicity combined with the highly prejudicial nature of the polygraph results, the supreme court held that the jurors' claims to impartiality could not be accepted, and any jurors with knowledge of the polygraph results should have been excused. *Id.* "If the biasing effect of the information is so powerful that it cannot be considered, even under the controlled conditions of the courtroom, then certainly access to the same biasing information, under the uncontrolled influence of the news media, cannot be allowed to affect the outcome of a trial." *Id.* at 392.

¶ 54 In the present case, 8 out of the 12 selected jurors had heard or read about the case before the trial. However, that, by itself, is not enough to require reversal, as "[t]otal ignorance of the case is exceptional, and it is not required." *Id.* at 386. Each potential juror

was individually questioned outside of the presence of the other potential jury members so as not to contaminate the jury pool. The jurors who had indicated that they had read or heard about the case were individually questioned about what they heard or read, were asked whether they had formed any opinion on the case, and were asked whether they could set aside any of their previous opinions and decide the case based on the evidence at trial. None of the jurors remembered the case in any detail; they either did not know anything about the case or had just heard about it when it first happened (over three years earlier). A lapse of time between the publicity and actual trial may be sufficient to dissipate any feeling of prejudice resulting from the pretrial publicity. *People v. Black*, 52 Ill. 2d 544, 558 (1972). Moreover, we note that each juror stated that, despite any preexisting knowledge of the case, he or she could render a verdict based solely on the evidence presented at trial.

¶ 55 In denying the defendant's motion to change the place of trial, the trial court conceded that there had been a great deal of publicity about the case, but the court stated that the individuals who had already formed opinions and might have knowledge about the case would not be acceptable jurors and that any bias would be discovered in *voir dire*. The extensive *voir dire* questioning by the court and counsel here established that the jurors could render an impartial verdict. Moreover, this case is distinguishable from *Taylor*, as the media coverage in November 2003 following Hernandez's guilty plea where the State indicated that there was one more prosecution to go was not as highly prejudicial as the polygraph evidence at issue in *Taylor*, especially where there was no indication that the selected jurors even heard that statement. Thus, we cannot say that appellate counsel's

25

performance was deficient where the record reveals that the media coverage did not prevent the jurors from being impartial. Because this underlying issue has no merit, the defendant suffered no prejudice by his appellate counsel's failure to raise it on direct appeal. Accordingly, we conclude that the trial court did not err in dismissing the defendant's *pro se* postconviction petition.

¶ 56                          III. CONCLUSION

¶ 57    For the reasons stated, we affirm the judgment of the circuit court of Williamson County.


¶ 58    Affirmed.